This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------

No. 119
Janice Mazella, &c.,
            Respondent,
        v.
William Beals, M.D.,
            Appellant,
et al.,
            Defendant.

            Kevin T. Hunt, for appellant.
            Alessandra DeBlasio, for respondent.

RIVERA, J.:

        In this medical malpractice and wrongful death action,

we conclude that the trial court erroneously admitted evidence

concerning defendant's negligent treatment of twelve other

patients, and that this evidence tainted the jury's deliberative

- 1 -

process.  On the facts of this case, the trial court abused its discretion by admitting evidence that was irrelevant to defendant's liability and that unduly prejudiced the jury. Therefore, the Appellate Division should be reversed and a new trial ordered.

I.

Plaintiff Janice Mazella commenced the instant action against defendant William Beals, M.D. and codefendant Elizabeth Mashinic, M.D., claiming that their substandard medical treatment of her husband, Joseph Mazella, proximately caused his suicide. At trial, defendant Beals admitted he deviated from accepted medical practice by prescribing decedent the antidepressant drug Paxil for over a decade while failing to adequately monitor his condition.  However, defendant Beals maintained that he was not liable for malpractice because superceding acts severed the causal connection between his conduct and the suicide, including medical care provided by Dr. Mashinic.  For her part, plaintiff argued that defendant Beals' treatment and conduct towards decedent was a contributing factor leading to decedent's death. A jury found defendant Beals solely liable and he now appeals.

Defendant began treating decedent in October 1993, when he diagnosed him with major depression, obsessive-compulsive disorder and generalized anxiety disorder.  Defendant prescribed 20 mg. of Paxil and eventually discontinued decedent's anti-anxiety Klonopin medication, previously prescribed to decedent by

his family physician.  In April 1994, defendant tapered off decedent's Paxil dosage and instructed decedent to discontinue it the following month, and to call him if there were any problems.

Decedent next contacted defendant on April 7, 1998, following an episode of depression.  Defendant concurred with the recommendation of decedent's family physician that decedent should be placed on the anti-anxiety drug Ativan and 40 mg. of Paxil.  Within a few weeks decedent showed improvement and defendant reduced the Ativan dosage, eventually discontinuing it within the month.  Defendant also reduced decedent's Paxil dosage to 20 mg.

For more than ten years, defendant refilled the prescriptions for Paxil by telephone or fascimile, without seeing or examining decedent.  Then on August 9, 2009, decedent called defendant complaining about anxiety, an increase in obsessive thoughts, and difficulty sleeping.  Defendant, who was away on vacation at the time, was unable to see decedent but instructed him to double the Paxil dosage to 40 mg.  He also prescribed the anti-psychotic medication Zyprexa, for decedent's anxiety and sleep problems.  The following day, on August 10th, decedent and plaintiff called defendant.  They told defendant that decedent was pale, nauseous, lightheaded, and did not feel well. Defendant instructed decedent to double the Zyprexa and that he would call him the next day in the late afternoon.

On August 11th, plaintiff observed decedent's condition

worsen and she took him to the emergency room.  After decedent was cleared medically he was transferred to the hospital's Community Psychiatric Emergency Program (CPEP) for overnight observation.  According to the hospital records admitted into evidence, decedent complained of suicidal ideations, difficulty sleeping and controlling his thoughts, and feeling as if his body was on fire inside.  That night he was taken off Zyprexa and given Ativan.  Upon his discharge the following day, decedent was told to discontinue Zyprexa, take Klonopin, and reduce his Paxil dosage to 30 mg.

For the next five days decedent appeared stable.  On August 17th, plaintiff and decedent visited defendant, now returned from vacation.  This would be the last time defendant had contact with decedent before the suicide.

Both parties presented differing accounts of decedent's August 17th visit to defendant's office.  According to plaintiff, defendant's conduct had a devastating adverse impact on decedent's condition.  Plaintiff testified that defendant yelled at them, and that he appeared angry that she had taken her husband to CPEP because defendant viewed this as decedent trying to get help from someone else.  She also claimed that defendant degraded decedent, accusing him of not taking more Paxil in the past "because [decedent] couldn't get an erection."  In response to defendant's comments, decedent pulled his shirt over his head, even while plaintiff tried to comfort him.  According to

plaintiff, defendant abruptly ended the session by standing up, waving them off and telling decedent "Just go to CPEP. That's where you belong." Plaintiff further claimed that defendant "threw [them] out of his office. He turned his back," and never said goodbye. When decedent left he was a "crumbling mess," and went to CPEP because he believed defendant was refusing to take care of him.

In contrast, defendant testified that during the August 17th visit, decedent was unresponsive and cried, and that when decedent spoke he was very upset because he felt that his wife thought he was acting like a baby. It was also the first time decedent could not assure defendant that he would not act upon his suicidal thoughts. Defendant advised decedent that the only option left was inpatient treatment at CPEP. Decedent rejected this advice because he did not want to be seen in a local psychiatric facility, and because decedent felt he could not go a period of time without working. Despite the differences in their respective accounts of the August 17th visit, defendant corroborated plaintiff's testimony that decedent pulled his shirt over his head, adding that decedent had been sobbing, and that he had never seen decedent act this way. He also admitted that he raised his voice, but claimed that he did so to emphasize that he could not be sure outpatient treatment would be adequate to address decedent's suicidal thoughts. Defendant testified that decedent eventually agreed to go to CPEP, and, as far as

defendant knew, decedent remained his patient.

There is no dispute as to what happened after decedent last saw defendant. Decedent went to CPEP later that day and, while he initially declined inpatient care, after he complained of being suicidal he was placed on 15-minute safety checks for the next 27 hours and his access to "lethal means of suicide" was restricted. The following day, August 18th, he complained of feeling hopeless and worthless, and repeated that he would kill himself. His medications were adjusted and he was discharged.

After a difficult and restless night, decedent returned to CPEP on August 19th. He was administered Ativan, and placed on 15-minute safety checks for about 12 hours. That evening he was involuntarily transferred to the psychiatric unit at Auburn Memorial Hospital (Auburn).

On August 20th, decedent met with Dr. Mashinic. She adjusted his medication and placed him on a multi-drug regimen of increased Paxil, Klonopin, Zyprexa, Ativan, and another anti-psychotic drug. That night, after Dr. Mashinic discontinued the one-on-one suicide watch, decedent attempted suicide by tying the belt of his hospital gown around his neck. Dr. Mashinic re-instated the suicide watch, and again changed decedent's medications, replacing Paxil with another anti-depressant, and added Risperdal. Over the course of a week, doctors at Auburn adjusted decedent's medications as he continued to complain about anxiety and depression, and increased repulsive thoughts of a

sexual nature.  At times he reported a decrease in depression, but still complained of difficulty sleeping and relaxing.

Decedent was discharged on August 27th, and referred to the Brownell Center for out-patient psychiatric care.  Brownell had a three-part screening and intake process, which decedent commenced on September 3, 2009, when he met with a social worker. At this time he complained of suicidal and obsessive sexual thoughts.  During his second intake visit, on September 9th, he met with a psychotherapist and told her that everything was overwhelming, that he felt "as if someone had taken his brain out," and that he had "suicidal thoughts come and go."  The Brownell psychotherapist scheduled an accelerated third intake appointment for September 11th.  However, Brownell was unable to obtain decedent's previous medical records in time for this appointment.  As a consequence, on September 11th decedent met instead with an independent licensed social worker and psychotherapist recommended by a family member.  Decedent told the psychotherapist that he had suicidal thoughts, but could not act on them because of his daughters.  The psychotherapist concluded decedent was not at risk of committing suicide and made plans to check up on him the next day.

As it turned out, decedent did not have any further contact with any medical professionals.  Early on September 12, 2009, decedent went to his garage and committed suicide by stabbing himself with a knife.  Shortly after, plaintiff found

him there, face down in a pool of blood.

                              II.

          In June 2010, plaintiff, as administrator of decedent's
estate, commenced this medical malpractice and wrongful death
action against defendant and Dr. Mashinic.  She alleged that
defendant's treatment of decedent was negligent, as demonstrated,
in part, by his failure to properly prescribe and monitor
decedent's medication, and adequately diagnose decedent's
worsening condition during the August 17, 2009 office visit.  She
further claimed defendant's negligence was a direct and proximate
cause of his suicide.  With respect to Dr. Mashinic, plaintiff
alleged that her treatment at Auburn was negligent, and that her
conduct was also a direct and proximate cause of decedent's
suicide.

          Prior to trial, defendant filed a motion in limine to
preclude, among other things, the admittance of a consent
agreement between defendant and the Office of Professional
Medical Conduct (OPMC).[1]  The OPMC is part of the New York State
Board for Professional Medical Conduct and is responsible for
investigating complaints against physicians, coordinating
disciplinary hearings and enacting sanctions as required.  In

---

[1] Defendant signed two consent agreements.  Only the one
dated February 14, 2012, by which defendant agreed not to contest
certain negligence charges, was admitted at trial and, therefore,
relevant to this appeal.

January 2012, OPMC brought misconduct charges against defendant, alleging that he "deviated from accepted standards of medical care" by prescribing medications to 13 patients over several years without adequately monitoring and evaluating them, and often without any face-to-face visits. Decedent was one of the listed patients.  By Consent Agreement and Order dated and finalized in February 2012 (Consent Order), defendant agreed not to contest charges of negligence based on allegations involving his treatment for 12 of the 13 patients, specifically excluding decedent.[2]

Defendant argued, in part, that the Consent Order was not probative evidence of his negligence with respect to decedent, and was unduly prejudicial because none of the uncontested charges involved decedent or addressed the proper treatment for a patient with a long history of depression, anxiety and OCD.  Defendant contended that introduction of the Consent Order would serve only to unfavorably "sway" the jury. The court denied the motion and determined that the Consent Order "would be admissible in full with regard to the issues surrounding not only the [decedent's] case, but also [the other patients], based on testimony of habit and credibility."  Prior to trial, defendant conceded that prescribing Paxil to decedent

---

[2] In accordance with the Consent Order, defendant agreed to a term of probation, which included review by OPMC of defendant's performance and a requirement that he only practice medicine when monitored by another physician.

over the course of more than ten years without any face-to-face contact was a deviation from acceptable medical practice. On the day trial was scheduled to begin, defendant renewed his motion to preclude the Consent Order, arguing that, in light of his concession, it was no longer probative of any disputed issue. The court again denied the motion.

The Consent Order was later admitted into evidence during defendant's testimony. When plaintiff called defendant as a witness, he testified that he failed to appropriately monitor decedent from 2000-2009 while decedent was on Paxil, but denied that this constituted malpractice. Over defense counsel's objection, the court admitted the Consent Order and allowed plaintiff to question defendant about its contents. During that questioning defendant was repeatedly confronted with the fact that OPMC had charged him with "gross negligence" with regard to 13 patients, including decedent, and that defendant signed the Consent Order in satisfaction of the charges, receiving a reprimand and censure as punishment for his misconduct.

Defendant also sought to preclude admission of a photograph of decedent taken after his suicide, arguing that it lacked probative value because there was no dispute as to the manner of decedent's death. The court allowed the photograph into evidence "not only on the issue of how [decedent] went about what he did, but also the pain and suffering issues and the other related issues."

At trial, each party submitted expert testimony to persuade the jury of their own respective theory of negligence and causation. Plaintiff relied on Dr. Peter Breggin, a licensed physician in New York with a specialty in psychiatry. Dr. Breggin concluded that defendant deviated from accepted medical standards by failing to monitor decedent for years while prescribing Paxil, and by later abandoning him as a patient, and that defendant's conduct was a significant contributing factor to decedent's suicide. He explained that following more than 10 years of unmonitored Paxil dosing, defendant worsened decedent's condition by doubling his Paxil prescription and adding Zyprexa after decedent telephoned him on August 9th. He described this as "a turning point" with catastrophic results for decedent. According to Dr. Breggin, doubling decedent's Paxil was hazardous because it greatly increased the impact of a very potent drug, and notably is not recommended by the Federal Food and Drug Administration.

Dr. Breggin also testified to the impact on decedent's already vulnerable condition when he finally had a face-to-face visit with defendant on August 17, 2009. He explained that when a patient visits a psychiatrist they are feeling hurt and self-conscious. According to Dr. Breggin a person who is very distressed, having a great deal of emotional difficulty, is particularly sensitive to humiliation -- to being rejected, abandoned and invalidated. A doctor cannot turn a patient away,

but instead has to ensure there is adequate followup.  Dr. Breggin concluded that after August 17th, decedent never again established a secure relationship with a physician and had "really been cast at sea by" defendant.  He also testified, as established by the photograph and the autopsy report, that decedent's suicide was "very violent and bloody," and that such suicides are often associated with the use of antidepressants.[3]  Therefore, in Dr. Breggin's opinion, defendant's actions on August 17th, after years of failing to monitor decedent's prescription medication and doubling the Paxil dosage over the telephone without an in-person assessment of decedent, were a significant contributing factor to decedent's suicide.

For his part, defendant presented testimony from Dr. Benson Zoghlin, a family physician, who explained that defendant's 10 years of prescribing Paxil without seeing decedent did not contribute to the suicide because decedent was doing well during that period.  According to Dr. Zoghlin, decedent only appeared to decompensate when he was hospitalized and his medication was substantially readjusted.  In his opinion, decedent's major depressive disorder caused his death, rather then any action taken by defendant.

Dr. Thomas Schwartz, a licensed doctor board certified

---

[3] In addition, Dr. Breggin testified that it was Dr. Mashinic's responsibility to ensure that decedent had a psychiatrist when he was discharged from Auburn, and that her conduct also served as a contributing factor to the suicide.

in psychiatry, also testified on behalf of defendant. He explained that individuals, like decedent, who are suffering from a major depressive disorder and obsessive-compulsive disorder at the same time pose a high risk of suicide. He also opined that the benefits of the different medications that defendant prescribed to decedent outweighed any risks.

The jury returned a verdict for plaintiff, finding both defendant and Dr. Mashinic negligent, but that only defendant's negligence proximately caused decedent's suicide. The jury awarded $1,200,000 in damages and apportioned $800,000 to plaintiff and $400,000 to be divided among decedent's three surviving daughters. The court denied defendant's motion to set aside the verdict, and entered an amended judgment for plaintiff in accordance with the money damages awarded by the jury.[4]

The Appellate Division affirmed, with one justice dissenting (122 AD3d 1358 [4th Dept 2014]). We granted defendant leave to appeal (25 NY3d 901 [2015]), and now reverse.

III.

Defendant asserts several grounds for reversal.[5]

_____

[4] Supreme Court entered an amended judgment to correct a typographical error in the original judgment.

[5] The Appellate Division rejected defendant's claim that the verdict was against the weight of the evidence and we are without authority to consider this additional ground on appeal (see Heary Bros. Lightning Protection Co., Inc. v Intertek Testing, 4 NY3d 615, 618 [2005]; Karger, Powers of the New York Court of Appeals

First, he claims the verdict is legally insufficient because plaintiff failed to establish defendant was the proximate cause of the suicide.  Second, defendant argues that he was denied a fair trial by the trial court's admission into evidence of the Consent Order and the photograph of decedent's body.  Third, defendant argues that the trial court abused its discretion when it denied his request for a special verdict sheet on liability and damages.  We conclude that although the evidence was sufficient to support the verdict, the trial court committed reversible error when it admitted the Consent Order and permitted defendant to be questioned regarding its contents.

### A.   Legal Sufficiency of the Evidence

To succeed on his legal insufficiency claim, defendant must establish "there is no valid line of reasoning or permissible inferences which could possibly lead rational [persons] to the conclusion reached by the jury on the basis of the evidence presented at trial" (Cohen v Hallmark Cards, Inc., 45 NY2d 493, 499 [1978]).  This is a "basic assessment of the jury verdict" and prohibits a holding of insufficiency "in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon" (id.).

In a medical malpractice action, the plaintiff must

_____

§ 13:2, at 454).

show that the defendant "deviated from accepted medical practice, and that such deviation was a proximate cause of the plaintiff's injury" (James v Wormuth, 21 NY3d 540, 545 [2013]). Defendant conceded that he deviated from accepted medical standards by failing to properly monitor decedent, and on appeal he argues only that the evidence does not support a jury determination that his negligence was a proximate cause of the suicide.[6]

A defendant's negligence qualifies as a proximate cause where it is "a substantial cause of the events which produced the injury" (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980]). However, "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed" (id.). As this Court has explained, "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence" (id., citing Parvi v City of Kingston, 41 NY2d 553, 560 [1977]). Only where "the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct," may it possibly

---

[6] Even without defendant's concession of negligence on appeal, plaintiff presented ample evidence of such negligence at trial. Namely, plaintiff's expert testified that defendant deviated from accepted medical standards by prescribing Paxil for 10 years and adding Zyprexa without properly monitoring or seeing decedent, and by providing ineffective care during the August 17th meeting, leaving decedent feeling humiliated and abandoned.

"break[] the causal nexus" (id.).  The mere fact that other persons share some responsibility for plaintiff's harm, does not absolve defendant from liability because "there may be more than one proximate cause of an injury" (Argentina v Emery World Wide Delivery Corp., 93 NY2d 554, 560 n2 [1999]; see also NY Pattern Jury Instr.--Civil 2:71).

Defendant contends that decedent's hospitalization at Auburn and treatment by other medical professionals after defendant last saw him on August 17, 2009, were intervening and superseding events that broke any casual connection between defendant's conduct and decedent's suicide.  He further argues that the suicide is too far removed from defendant's treatment of decedent to be considered proximate.  We hold his claims to be without merit.

Although several events transpired after his last meeting with decedent on August 17th, there was sufficient trial evidence for the jury to conclude that, regardless of these events, defendant proximately caused decedent's suicide. Defendant admitted to negligently treating decedent for over a decade, which was further corroborated by evidence of the specific manner in which he prescribed Paxil for over 10 years without properly monitoring or meeting with decedent.  There was also trial evidence supporting plaintiff's argument that the violent nature of the suicide indicated it was connected to decedent's prescription drug use.  Furthermore, the jury could

have credited plaintiff's version of the August 17th office visit and concluded that defendant's conduct worsened decedent's condition, leading to his suicide.

Significantly, plaintiff's expert provided testimony to assist the jury in connecting defendant's negligence with decedent's suicide, lending further record support for the verdict. Dr. Breggin testified that, in his considered expert opinion, what led to decedent's suicide was a multistage process.

> "I think it begins with ten years unmonitored on Paxil, so that he's inevitably going to have a horrific withdrawal reaction when he's abruptly stopped. In other words, even though it's covered over with other drugs, the brain just can't bounce back after ten years . . . . The lack of monitoring, very likely, contributed. By his not having anyone that he had a relationship with to go to, by his not having someone to observe whether he was in some way, getting worse on the drug because the family isn't going to necessarily notice, and it happens over time . . . . Then the August 9th, 2009 prescription of Zyprexa and the doubling of the dose of the Paxil on the phone, sight unseen, with no records, was the real beginning of the catastrophe, because at that moment, he seemed as though he was having a problem like he had had twice before . . . . But now we have this new complication that he's doubling the dose, which is, the FDA recommends, no more than 10 milligrams at a time. He's given 20 additional milligrams. And adding Zyprexa, I think that's a real turning point for him, even though he's only on the Zyprexa for a few days."

He described how defendant's actions on August 17th tragically impacted decedent at a moment when he was most vulnerable.

"It's the start of the big decline and I
think that's very important.  I think his
visit later in August with the patient . . .
where the patient feels humiliated,
invalidated, rejected, abandoned, remarkable
words to find in a medical record, rejection,
abandonment and invalidated, marked and
unseen in a medical record and by a doctor.
That was a very, very big impact, and it left
him with no relationship.  The main
preventative of suicide that we know of is a
good relationship with a
therapeutically-oriented professional.  He
was bereft of that.  He has nobody he's going
to trust and it's going to make it hard to
trust after that."

It was then for the jury to decide the persuasiveness of this

testimony, and to consider it along with the opinions of

defendant's opposing experts (see People v Drake, 7 NY3d 28, 33

[2006] ["jurors remain always free to accept or reject expert

evidence"]; People v Negron, 91 NY2d 788, 792 [1998] ["a jury is

entitled to assess the credibility of witnesses and determine,

for itself, what portion of their testimony to accept and the

weight such testimony should be given"]).

        To the extent defendant claims there is legally

insufficient evidence of a causal nexus because the third party

acts were unforeseeable, we disagree.  There is no superceding

event if "the intervening act is a normal or foreseeable

consequence of the situation created by the defendant's

negligence" (Derdiarian, 51 NY2d at 315).  Defendant concedes

that when he last saw decedent alive on August 17th, decedent's

conduct was unusual.  Decedent was anxious and very upset and,

for the first time, he was unable to assure defendant that he

could control his suicidal thoughts.  According to plaintiff, defendant threw decedent out of his office when he was desperately in need of help, leaving decedent a "crumbling mess." The jury could have fully credited plaintiff's version of these events and Dr. Breggin's opinion about decedent's condition when he left defendant's office.  Thus, the jury could have concluded that it was foreseeable that decedent would seek treatment by others and that the treatment could potentially be lacking. Under these circumstances, we cannot say that the intervening acts are "of such an extraordinary nature or so attenuate[] defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant" (Kush by Marszalek v City of Buffalo, 59 NY2d 26, 33 [1983]).

This case required the jury to consider decedent's mental health treatment and the delicate and complex functioning of the brain and human emotion under prescription drug use. The jury was presented with evidence of the long-term impact of defendant's negligence on decedent's condition, as well as evidence that subsequent medical treatment could be a foreseeable consequence of defendant's actions.  Since a valid line of reasoning and permissible inferences could lead rational persons to find defendant liable for medical malpractice based on this evidence, we conclude defendant's legal insufficiency claim is without merit (see Cohen, 45 NY2d at 499).

B.  Evidentiary rulings

Defendant also claims that, even if there was evidence sufficient to support the verdict, certain evidentiary rulings by the trial court denied him a fair trial.  He argues that the court erroneously admitted evidence of the photograph of decedent's body and the Consent Order.  Although the court did not abuse its discretion in admitting the photograph, we agree with defendant that admission of the Consent Order was an abuse of discretion warranting reversal and a new trial.

Since "[t]rial courts are accorded wide discretion in making evidentiary rulings . . . absent an abuse of discretion, those rulings should not be disturbed on appeal" (People v Carroll, 95 NY2d 375, 385 [2000]).  To be admissible, evidence must be relevant and its probative value outweigh the risk of any undue prejudice (People v Morris, 21 NY3d 588, 595 [2013]).

Defendant's claim that the photograph should have been precluded because it lacked probative value and served only to arouse the jury's emotions is without merit.  The photograph depicted the manner in which decedent committed suicide and was relevant to plaintiff's theory that the violent nature of the suicide -- death by self-inflicted knife wounds -- was a result of decedent's extreme mental and emotional condition, induced by the long-term use of prescription drugs.  Nor was its admission unduly prejudicial since there was already testimony from a paramedic describing the condition in which he found the body,

and the official autopsy report from the Medical Examiner's Office was admitted into evidence without objection. Therefore, the court did not abuse its discretion in admitting the photograph.

The trial court's admission of the Consent Order into evidence is a wholly different matter. Generally, "it is improper to prove that a person did an act on a particular occasion by showing that he did a similar act on a different, unrelated occasion" (Matter of Brandon's Estate, 55 NY2d 206, 210-211 [1982], citing Richardson, Evidence [10th ed], §§ 170, 184; see also Coopersmith v Gold, 89 NY2d 957, 959 [1997]). Contrary to plaintiff's argument, none of the exceptions to this rule -- motive, intent, the absence of mistake or accident, a common scheme or plan, or identity -- apply in this case (see Matter of Brandon, 55 NY2d at 211). Moreover, even though the Consent Order was a public document, and under Public Health Law § 10 (2) possibly admissible as "presumptive evidence of the facts stated therein if otherwise properly rendered admissible evidence," under these facts it should not have been admitted.

The record establishes that the Consent Order was neither probative of defendant's negligence or the question of proximate cause. As part of the Consent Order defendant agreed not to contest negligent treatment of certain anonymous patients, none of whom was the decedent. As such, defendant preserved his objections to factual allegations related to decedent and any

charges of misconduct based on those allegations.  Since the Consent Order did not establish facts concerning defendant's treatment of decedent, it was not probative as to that issue.  In any event, given defendant's pre-trial concession that he deviated from accepted medical practice, the issue of negligent treatment did not require resolution by the jury.

Further, any possible relevance of the Consent Order's contents was outweighed by the obvious undue prejudice of his repeated violations of accepted medical standards (see Maraziti v Weber, 185 Misc 2d 624, 626 [Sup Ct Dutchess County 2000] [court denied admittance of an OPMC report detailing previous instances of defendant's negligence since such evidence was "of marginal relevance at best, but would be likely to unduly prejudice the jury"]).  The Consent Order was nothing more than evidence of unrelated bad acts, the type of propensity evidence that lacks probative value concerning any material factual issue, and has the potential to induce the jury to decide the case based on evidence of defendant's character (see People v Arafet, 13 NY3d 460, 464-465 [2009] ["Evidence of uncharged crimes is inadmissible where its only purpose is to show bad character or propensity towards crime"]; Hosmer v Distler, 150 AD2d 974, 975 [3d Dept 1989] [trial court properly excluded defendant's prior convictions for driving while intoxicated and that he had a habit of excessive drinking as unfairly prejudicial propensity evidence]).

Plaintiff's additional argument that the Consent Order was admissible to impeach defendant as an admission and as a prior inconsistent statement is also without merit.  Plaintiff claims she was entitled to present this evidence to the jury once defendant testified that although he was negligent in prescribing Paxil for 10 years without monitoring decedent, his conduct was not malpractice.  As a preliminary matter, defendant's testimony was not inconsistent because the Consent Order did not include any assertions or concessions regarding defendant's treatment of decedent.  In addition, since medical malpractice requires a finding of causation (James, 21 NY3d at 545), defendant could concede negligent treatment and still maintain his conduct did not constitute malpractice as a legal matter.

We are also unpersuaded by plaintiff's claim that the evidence was admissible to impeach defendant's credibility. Collateral matters relevant only to credibility are properly excluded because they distract the jury from the central issues in the case, and bear the risk of prejudicing the jury based on character and reputation (see Badr v Hogan, 75 NY2d 629, 635 [1990]; People v Schwartzman, 24 NY2d 241, 245 [1969]; see also Richardson, Evidence [11th ed], § 4-410).  It is an abuse of a trial court's discretion to admit evidence of bad acts when such evidence lacks any probative value, or bears only marginal relevance, outweighed by its prejudicial effect (see Badr, 75 NY2d at 635; Richardson, Evidence [11th ed], §§ 4-410, 4-501).

Here, given defendant's concession at trial that he deviated from accepted medical practices, the Consent Order was unquestionably collateral, without probative value, and, regardless, improperly prejudicial.

On the facts of this case, there were no permissible grounds to allow the Consent Order into evidence. Morever, notwithstanding that under CPLR 2002 "[a]n error in a ruling of the court shall be disregarded if a substantial right of a party is not prejudiced," here, admission of the Consent Order tainted the deliberative process, and sufficiently prejudiced defendant, such that we cannot disregard this error. Given the multiple allegations of defendant's negligent monitoring of prescription drug treatment, and the numerous patients referenced in the Consent Order, we cannot say that the verdict was not influenced by this powerful evidence of defendant's professional misconduct. Indeed, it is difficult to imagine how a jury could simply ignore that defendant negligently treated 12 other patients for years in a similar manner as decedent, namely failing to monitor them, and that this conduct resulted in OPMC charges leading to its oversight of his medical practice.

This point was not lost on plaintiff, who repeatedly referred to defendant's acts of negligence and, during summation, explicitly relied on the Consent Order to link prior allegations of defendant's negligence with plaintiff's current claims. In light of the prejudicial nature of the Consent Order and its

repeated use at trial we cannot say that its admission did not have a substantial impact on the verdict.

Here the evidence portrayed defendant as a serial pill pusher, oblivious to the health and safety of those in his care, and a danger to patients.  Since the evidence could have induced the jury to punish him for his unrelated misdeeds, admission into evidence of the Consent Order was sufficiently prejudicial to defendant so as to require a new trial (see Badr, 75 NY2d at 637 [cross-examination of a witness with prior bad acts was "sufficiently prejudicial" to require a new trial]; compare with Geary v Church of St. Thomas Acquinas, 98 AD3d 646, 647 [2d Dept 2012], lv denied 20 NY3d 860 [2013] [no new trial required when the court improperly precluded evidence since "there is no indication that the evidence would have had a substantial influence on the result of the trial"]).


C.   The General Verdict Sheet

Given our determination that defendant is entitled to a new trial, we briefly address his claims that use of a general verdict sheet was improper.  Defendant argued that the court should have provided the jury with a special verdict sheet with individual interrogatories because plaintiff relied on three different theories of liability.  However, there was a single theory of liability presented to the jury based on the defendant's continuum of negligent treatment.

Although defendant did not propose to the trial court the specific type of special verdict he now advocates, such a special verdict sheet itemizing the subcategories of damages may assist a court's review of the jury's monitory award (CPLR 4111 [d]; see Killon v Parrotta, 125 AD3d 1220, 1223 [3d Dept 2015]). On retrial, defendant should be afforded the opportunity to argue in support of a special verdict sheet on damages.

Accordingly, the order should be reversed, with costs, and a new trial ordered.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order reversed, with costs, and a new trial ordered. Opinion by Judge Rivera. Chief Judge DiFiore and Judges Pigott, Abdus-Salaam, Stein and Garcia concur. Judge Fahey took no part.

Decided June 30, 2016