## Goldfarb v New York City Health & Hosps. Corp.

2025 NY Slip Op 31890(U)

May 22, 2025

Supreme Court, Kings County

Docket Number: Index No. 531901/2021

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part MMESP-7 of the
Supreme Court of the State of NY, held
in and for the County of Kings, at the
Courthouse, at 360 Adams Street,
Brooklyn, New York, on the 22nd day
of May 2025.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------------X
ADAM GOLDFARB, as Administrator of the Estate of
SARAH GOLDFARB, a/k/a SARAH MARY GOLDFARB,
deceased, ADAM GOLDFARB and ERICA GOLDFARB,
individually,

**DECISION & ORDER**

Index No. 531901/2021
Mo. Seq. 1

        Plaintiffs,

  -against-


NEW YORK CITY HEALTH & HOSPITALS
CORPORATION, HAJIR DILMANIAN. M.D., NEW YORK-
PRESBYTERIAN BROOKLYN METHODIST HOSPITAL,
DEEPAK ASTI, M.D., NEW YORK HEART AND
VASCULAR SPECIALISTS, P.C., WYCKOFF HEIGHTS
MEDICAL CENTER, MARK A. SELDON, M.D. and
CARDIOVASCULAR CONSULTING OF NEW YORK, P.C.,

        Defendants.
------------------------------------------------------------------------X
**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C.**
Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: 89 – 90, 91 – 127, 129, 130 – 148, 149 – 151, 152 – 154

Defendants Hajir Dilmanian, M.D. ("Dr. Dilmanian") and New York-Presbyterian

Brooklyn Methodist Hospital ("Methodist Hospital") move (Seq. No. 1) for an Order, pursuant to

CPLR 3212, granting summary judgment in their favor and dismissing Plaintiffs' complaint and

any claims against them in this action.

Plaintiffs oppose the motion.

Plaintiffs commenced this action on December 14, 2021, on behalf of Decedent's estate,

asserting claims of medical malpractice, lack of informed consent, and wrongful death against

1

[* 1]

INDEX NO. 531901/2021

RECEIVED NYSCEF: 05/22/2025

the movants and others. The claims arise from an alleged failure to diagnose and treat Decedent's heart disease prior to her death in December 2019.

Prior to the claims against the moving defendants, Decedent presented to a CityMD urgent care center (not a party to this action) on August 2, 2019. She was 27 years old and had complaints of upper abdominal pain and dyspnea (shortness of breath) on exertion. The medical professional at the urgent care center sent her by ambulance to Woodhull Hospital (defendant New York City Health & Hospitals Corporation), where she underwent an EKG and echocardiogram and was assessed with sinus bradycardia. According to the Woodhull records, an outpatient stress echocardiogram ("stress echo") was recommended by the cardiology consult. She was discharged on August 3 with instructions to follow up with a primary care provider and cardiologist.

On August 26, 2019, Decedent presented to movant cardiologist Dr. Dilmanian, at Methodist Hospital, for a cardiology evaluation. She reported no chest pain or shortness of breath according to his records. On physical examination, she had a low pulse rate, regular heart rhythm with no murmur or gallop, and normal blood pressure. Dr. Dilmanian performed an EKG and noted abnormal results, including T wave abnormality and marked sinus bradycardia with premature atrial complexes. He assessed she had possible left atrial enlargement and inferior ischemia. He ordered a stress echo and repeat transthoracic echocardiogram ("TTE") to be performed at Methodist Hospital. There is no record that these tests were ever scheduled. Decedent never returned to Dr. Dilmanian or Methodist Hospital.

Subsequent to her visit with Dr. Dilmanian, Decedent had a syncopal (fainting) episode on October 28, 2019 while running on a treadmill. She was taken to defendant Wyckoff Heights

2

[* 2]

emergency department and treated by defendant Deepak Asti, M.D. She later followed up with another defendant cardiologist, Mark A. Seldon, M.D. ("Dr. Seldon") on November 4, 2019.

On December 11, 2019, Decedent collapsed while using a treadmill and was taken by ambulance to Wyckoff Heights, then transferred to non-party Lenox Hill Hospital the following day. On December 18, 2019, she was declared brain dead and removed from life support. An autopsy restricted to the heart determined her cause of death was sudden cardiac arrest, secondary to cardiac arrhythmia from underlying cardiomyopathy, most likely arrhythmogenic right ventricular cardiomyopathy (ARVC), a genetic heart disease.

Plaintiffs allege that the movant Dr. Dilmanian departed from the standard of care by failing to obtain and review Decedent's hospital records, failing to order and schedule the stress echo and TTE tests in an expedited manner, and failing to order a cardiac MRI. Plaintiffs' claims against Methodist Hospital arise from vicarious liability for Dr. Dilmanian, as well as direct claims of failing to schedule follow-up tests. Plaintiffs further allege that these departures proximately caused a delay in diagnosis and treatment of Decedent's heart condition, which diminished her chance of a better outcome.

In support of their motion, Dr. Dilmanian and Methodist Hospital submit an expert affidavit from Henry S. Cabin, M.D. ("Dr. Cabin"), a licensed physician board certified in internal medicine, cardiovascular disease, and interventional cardiology.

The Court notes that Plaintiffs object to the form of Dr. Cabin's affidavit, as well as the other affidavit submitted by the movants from a Methodist Hospital employee, because these documents do not contain the "I affirm . . . under the penalties of perjury" language set forth in CPLR 2106. However, as the movants address in their reply affirmation, CPLR 2106 applies to an "Affirmation of truth of statement," which in recent years has been expanded from attorneys

3

[* 3]

and physicians to "any person," and may be used "*in lieu of with the same force and effect as an affidavit.*" (CPLR 2106.) In contrast, the submissions from Dr. Cabin and Tasha Briggs were "subscribed and sworn" before a New York state notary public and were presented in the format of an affidavit, which remains a valid and admissible form of evidence.

Dr. Cabin opines that Dr. Dilmanian complied with the standard of care in his evaluation and treatment of Decedent on August 26, 2019. He notes that she reported no ARVC symptoms at the time, denying chest pain, shortness of breath, or syncopal episodes. On physical examination, she had no signs of arrhythmia. For this reason, he opines there was no reason for Dr. Dilmanian to suspect ARVC or arrhythmia, and the standard of care did not require him to refer her to the emergency room for "any urgent testing or treatments."

Dr. Cabin opines that Dr. Dilmanian properly interpreted her August 26 EKG, which showed T wave abnormality, but because she was in no acute distress and reported no symptoms or relevant medical or family history, he "appropriately assessed that the abnormal EKG was asymptomatic." Although she had a below-normal pulse rate of 43, Dr. Dilmanian opines that her other vital signs were normal, and that marked sinus bradycardia is not uncommon for runners and athletes. Thus, Dr. Cabin opines that "there was no indication for [Decedent] to undergo STAT or urgent further cardiac tests" on the day she was treated by Dr. Dilmanian.

However, based on her abnormal EKG results, Dr. Cabin opines that Dr. Dilmanian appropriately ordered a stress echo for further evaluation. Dr. Dilmanian testified that he reviewed her August 2 TTE from Woodhull, which she brought with her and was included in his records. Dr. Cabin opines that it was "completely appropriate and within the standard of care" to rely on the August 2 EKG and echocardiogram results from Woodhull, and there was no need to obtain further records. The expert notes the prior TTE "showed elevated central venous pressure

4

[* 4]

but only mildly dilated left and right atriums and normal ejection fraction of 50%." He opines that these results were "inconsistent and required repeating." In sum, he opines Dr. Dilmanian appropriately ordered a follow-up stress echo and TTE at Methodist Hospital. Due to her lack of symptoms such as shortness of breath, dizziness, or fainting, Dr. Cabin opines that it was within the standard of care to order these tests to be scheduled "within the next couple of weeks," not on an urgent basis.

The movants' expert opines that scheduling a cardiac MRI was not warranted based on her history and presentation. Specifically, he opines she had no acute symptoms, arrhythmia, or syncopal episodes when she visited Dr. Dilmanian on August 26, and "the standard of care did not require a cardiac MRI without a prior abnormal stress echocardiogram or, at a minimum, a repeat abnormal TTE and other acute symptoms." Essentially, he opines that a cardiac MRI would only be indicated if the anticipated stress echo and/or repeat TTE had been performed first and if those results had been abnormal.

The expert further opines that it was not the standard of care for Dr. Dilmanian to follow up with Decedent about scheduling the stress echo or TTE, as he fulfilled his duty by ordering those tests and it was the role of the Methodist Hospital clerical staff to follow up with Decedent. He states that the staff attempted to contact Decedent multiple times and made reasonable attempts to schedule the tests.

On the issue of proximate causation, the movants' expert opines that no alleged departures of Dr. Dilmanian or Methodist Hospital were casually related to Decedent's claimed injuries or death, because she never returned for further testing or reported her subsequent symptoms after her visit on August 26, 2019. The expert notes that ARVC is a "rare familial disorder," and diagnosis requires "a high degree of clinical suspicion and frequently requires

5

[* 5]

INDEX NO. 531901/2021

RECEIVED NYSCEF: 05/22/2025

multiple diagnostic tests or procedures to confirm the diagnosis." Dr. Cabin states that Dr. Dilmanian did not proximately cause her delay in diagnosis or death because Decedent had "apparently ended the relationship" and never underwent the tests he recommended and ordered.

Additionally, the movants cite to testimony from Decedent's father that he encouraged her to undergo a stress echo after her appointment with Dr. Dilmanian, but she said she was "fine" and did not see another physician until her syncopal episode in October (Exhibit O at 47-48). The expert notes that she did not begin experiencing this symptom until October 28, 2019, two months after she presented to Dr. Dilmanian. At that time, she did not seek treatment from Dr. Dilmanian or Methodist Hospital, but instead visited another cardiologist, Dr. Seldon. The movants argue this point further in their reply affirmation, stating that her onset of syncopal episodes and subsequent treatment were a "superseding cause" of her injuries and death.

On the issue of whether Dr. Dilmanian and Methodist Hospital acted within the standard of care, the movants have met their prima facie showing of entitlement to summary judgment. The expert opines that Dr. Dilmanian appropriately reviewed the EKG and history she provided and ordered a follow-up stress echo and TTE, but the patient did not require those tests on an "urgent" basis when he evaluated her on August 26. The expert also opines that a cardiac MRI was not indicated by her presentation and history at that time. The expert opines that Dr. Dilmanian appropriately ordered a stress echo and repeat TTE to be scheduled within the next weeks, in accordance with the standard of care, and he had no further involvement in the patient's treatment. The movants also establish prima facie that it was the role of the Methodist Hospital staff to contact Decedent to schedule the stress echo and TTE, and he had no further duty beyond placing the order for those tests.

6

[* 6]

Further, the movants establish that the alleged departures of Dr. Dilmanian and Methodist Hospital did not proximately cause Decedent's claimed injuries, worsened outcome, or death. Generally, the fact Decedent received subsequent treatment from other defendant physicians does not, in and of itself, "absolve [moving] defendant from liability, because there may be more than one proximate cause of an injury" (*Mazella v Beals*, 27 NY3d 694, 706 [2016] [internal quotation marks and citation omitted]). However, a defendant may establish entitlement to summary judgment with a prima facie showing that the alleged deviation from the standard of care did not have any effect on the patient's illness or injury (*see Cerrone v N. Shore-Long Is. Jewish Health Sys., Inc.*, 197 AD3d 449, 450-451 [2d Dept 2021]; *Keevan v Rifkin*, 41 AD3d 661, 662 [2d Dept 2007]).

Here, the movants have established that Dr. Dilmanian's alleged failure to order a cardiac MRI, and his alleged failure to order the stress echo and TTE on an "expedited" basis, did not proximately cause Decedent's injuries and death. It is undisputed that Dr. Dilmanian did order a stress echo and TTE, but Decedent never returned to Dr. Dilmanian or Methodist Hospital after August 26, 2019. As Decedent did not undergo *any* further testing with the movants, there is no issue of fact as to whether the specific tests Dr. Dilmanian ordered resulted in Decedent's fatal arrhythmia and death months later.

The movants' submissions meet their prima facie burden of establishing Dr. Dilmanian did not depart from good and accepted medical standards, nor did those alleged departures proximately cause Decedent's claimed injuries, and therefore "the burden shifts to the plaintiff to rebut the defendant's showing by raising a triable issue of fact as to both the departure element and the causation element" (*Weber v Sharma*, 232 AD3d 930, 931 [2d Dept 2024], quoting *Stukas v Streiter*, 83 AD3d 18, 25 [2d Dept 2011]).

7

[* 7]

In opposition, Plaintiffs submit an expert affirmation in opposition from a licensed physician [name of expert redacted], board certified in cardiology, echocardiology, and nuclear cardiology. The unredacted, signed expert affirmation was presented to the Court for *in camera* inspection.

Plaintiffs' expert opines that Dr. Dilmanian departed from the standard of care in his treatment of Decedent on August 26, 2019. First, the expert opines that Dr. Dilmanian was required by the standard of care to obtain and review Decedent's August 2 medical records from CityMD and Woodhull. According to his own testimony and records, Dr. Dilmanian was not aware Decedent had a recent history of shortness of breath on exertion, and she did not report or present with this symptom when he evaluated her on August 26. The expert opines that the standard of care required Dr. Dilmanian to request copies of her records "to identify what specific complaints the patient made, what evaluations were done at CityMD and Woodhull Hospital, and what their assessment and plan was to evaluate her complaints."

The expert also opines that Dr. Dilmanian should have ordered the stress echo and TTE on an expedited, urgent basis, based on her current examination *and* her history of symptoms from CityMD/Woodhull. The expert notes that her prior EKG from August 2, which Dr. Dilmanian reviewed, was "significantly abnormal," that her echocardiogram from Woodhull Hospital was abnormal, that the EKG taken in Dr. Dilmanian's office was abnormal, and that she had symptoms including "dyspnea on exertion" and epigastric pain when she was treated at CityMD and Woodhull. The expert opines that the stress echo and TTE ordered by Dr. Dilmanian were required by the standard of care, but they should have been ordered "stat" or urgently in light of her full medical record.

8

[* 8]

Plaintiffs' expert opines that a "young athletic patient with evidence of cardiac abnormalities seen on diagnostic testing" is particularly at risk of structural cardiac abnormalities, life-threatening arrythmia, and sudden death. For this reason, the expert opines those conditions should be "at the top of any differential diagnosis" and "must be ruled out on an expedited basis," requiring the stress echo and TTE to be done sooner than "within a couple of weeks" as directed by Dr. Dilmanian.

Plaintiffs' expert also opines that Dr. Dilmanian also should have ordered a cardiac MRI. The expert disagrees with Dr. Cabin's opinion that a cardiac MRI would not be required unless the stress echo or repeat TTE, which Dr. Dilmanian ordered, returned with abnormal results. Rather, Plaintiffs' expert opines that in light of Decedent's prior abnormal EKGs, echocardiogram, *and* the fact she "presented to urgent care (CityMD) with dyspnea on exertion," Dr. Dilmanian already "expected" those tests to be abnormal and there was no reason to delay ordering a cardiac MRI as well. The expert opines that this test is the "gold standard" and "the most useful definitive test" for revealing structural heart abnormalities and cardiomyopathy, including ARVC.

On the issue of proximate causation, Plaintiffs' expert opines that a full review of Decedent's urgent care and Woodhull records would have revealed her key symptom of dyspnea on exertion, as well as epigastric pain. The expert states that "the additional information about [Decedent's] presenting symptoms would have necessitated ordering [the stress echo and TTE] on an expedited basis," and "the failure to obtain these records prevented Dr. Dilmanian from recognizing" that the tests should be ordered urgently.

Plaintiffs' expert further opines that if the expedited stress echo, TTE, and cardiac MRI were performed, they likely would have showed arrhythmic abnormalities and led to further

9

cardiac workup and diagnosis of her condition. The expert opines that if Decedent's structural cardiac abnormalities were diagnosed by a cardiac MRI as early as August 2019, she could have received "immediate treatment, including ordering an implantable cardiac defibrillator." The expert states that with early diagnosis and treatment. ARVC is a "treatable condition" for which she could have received beta blockers, an implantable cardiac defibrillator, or a pacemaker. The expert opines that all this would have given her the opportunity for a better outcome and prevented her death.

Based on the expert submissions, the Court finds Plaintiffs do not raise a genuine issue of fact as to the standard of care. The expert's primary contention is that Dr. Dilmanian had an obligation to obtain the patient's full medical chart from her visit to the CityMD urgent care and Woodhull on August 2 and review her "specific complaints," "what evaluations were done . . . and what their assessment and plan was." However, as the movants' expert noted, Decedent "expressly denied any complaints of shortness of breath" when Dr. Dilmanian personally examined her on August 26. She informed him she had recently been treated at Woodhull for abdominal pain, and she brought her EKG and echocardiogram results, which he reviewed. Plaintiffs' expert states in a conclusory manner that failing to "request copies of the patient's record" was a departure from the standard of care but does not address that Dr. Dilmanian relied on her own description of her history and symptoms, reviewed all the cardiac tests the patient had undergone on August 2, and he came to same conclusion as the Woodhull cardiologist's "assessment and plan" by recommending a stress echo. Therefore, the Court finds the expert's opinion that Dr. Dilmanian departed from the standard of care by obtaining inadequate medical history/treatment records is conclusory, unsupported by the record, and does not raise a triable issue of fact.

10

[* 10]

INDEX NO. 531901/2021

RECEIVED NYSCEF: 05/22/2025

All other opinions of the Plaintiffs' expert are based on a premise that is not supported by the record. The expert opines: "Had Dr. Dilmanian obtained the CityMD records and Woodhull Hospital records, he would have seen Ms. Goldfarb's presenting complaints [of dyspnea on exertion], he would have seen the plan that Ms. Goldfarb needed a follow-up echocardiogram and stress test, and that would have led him to order these diagnostic tests *as he did on August 26, 2019.* The difference is that *the additional information* about Ms. Goldfarb's presenting symptoms would have *necessitated ordering these tests on an expedited basis.*" Plaintiffs' expert concedes that Dr. Dilmanian ordered appropriate tests based on the information known to him and relies solely on her unknown history of dyspnea to opine that the tests should have been "expedited."

The expert's opinion that the standard of care required a cardiac MRI is similarly speculative and unsupported by the record. The expert states a cardiac MRI was "the logical and necessary next step" based on her abnormal EKGs and echocardiogram, but also relies on the assumption that Dr. Dilmanian knew her symptom of dyspnea on exertion, which he did not. Plaintiffs' expert repeatedly references that the patient was a young and "athletic" woman with "no history of cardiac problems or family history of cardiac problems." The expert does not offer any opinion to counter the movants' expert that she presented as "asymptomatic" on August 26, she had no signs of arrhythmia, and sinus bradycardia is not an uncommon finding in an athletic patient.

For these reasons, the Court finds Plaintiffs have not raised a genuine issue of fact as to whether Dr. Dilmanian departed from the standard of care in his treatment of Decedent.

11

[* 11]

Even if Plaintiffs had established there were issues of fact as to whether Dr. Dilmanian departed from the standard of care, they also fail to raise an issue of fact as to proximate causation.

As the movants note in their reply, the expert's opinions rely on a chain of unsupported assumptions, including that if Dr. Dilmanian ordered a cardiac MRI in an addition to the stress echo and TTE, Decedent *would have undergone* all those tests, and they *would have returned abnormal*, prompting further interventions. It is undisputed that Dr. Dilmanian ordered a follow-up stress echo and TTE, which Plaintiffs agreed was in accordance with the standard of care. Decedent never returned for those tests and did not seek further treatment from Dr. Dilmanian or Methodist Hospital, even after the onset of additional symptoms. Given the fact that none of the tests Dr. Dilmanian ordered on August 26 were scheduled or performed, Plaintiffs' argument that his failure to order a cardiac MRI proximately caused her injuries or death is speculative and unsupported by the record.

Plaintiffs' expert also repeatedly emphasizes the necessity of the tests being ordered "on an expedited basis," stating that a patient may otherwise "experience a fatal arrhythmia in the gap between when a standard, routine stress echo and treadmill stress test is ordered and when it is actually done." However, the Decedent's fatal cardiac event did not occur in that "gap" but over four months later, having never returned for the tests that Dr. Dilmanian ordered.

Thus, Plaintiffs' expert has failed to raise any triable issues of fact as to whether Dr. Dilmanian's alleged departures from the standard of care – specifically failing to obtain her prior records and order an "expedited" stress echo, TTE, and cardiac MRI – were a proximate cause of her worsened outcome and death. Accordingly, summary judgment must be granted to Dr.

12

[* 12]

INDEX NO. 531901/2021

RECEIVED NYSCEF: 05/22/2025

Dilmanian as to the medical malpractice and wrongful death claims, and to Methodist Hospital for any vicarious liability on behalf of Dr. Dilmanian.

With respect to the direct claims against Methodist Hospital regarding follow-up diagnostic tests, the movants submit a personal affidavit from Tasha Briggs ("Briggs"), an employee of Methodist Hospital under the title of Access Service Representative for the Department of Cardiology during the time at issue. According to her affidavit and supporting documentation, Briggs received an email dated August 28, 2019. two days after Dr. Dilmanian's evaluation, to schedule Decedent for a stress echo and TTE. The email included a list of multiple patients to be scheduled for outpatient tests. Briggs explained that the hospital's procedure involved contacting the patient's insurance company for pre-authorization, and if such authorization was approved or not required, calling the patient to schedule the test.

Briggs states that her custom and practice upon receiving such an email – unless the order was labeled "stat" or urgent – was to "contact the patient by phone and schedule their appointment within one to two weeks." If she could not reach the patient by phone, she states that her standard procedure was to leave two voicemails, and she had no further duty to contact a patient if they failed to return the calls or affirmatively declined to schedule the test.

The movants' expert opines that the hospital's clerical staff appropriately processed the stress echo and TTE order of Dr. Dilmanian, attempted to contact Decedent multiple times, and complied with their duty within the standard of care to follow up with the patient.

The Court finds these submissions are sufficient to establish prima facie entitlement to dismissal of any claims against Methodist Hospital for failing to follow up and schedule Decedent's stress echo and TTE, and the burden shifts to Plaintiffs to raise an issue of fact.

13

[* 13]

In opposition, Plaintiffs present phone records of incoming and outgoing calls from Decedent's phone, to support their argument that there is no evidence of follow-up calls from Methodist Hospital. In reply, the movants note that a different area code or unlisted number may have been used by the hospital staff. They further object to the use of these records on discovery grounds, with supporting documentation that Plaintiffs objected to their discovery demand for those records prior to filing the Note of Issue on September 17, 2024. Plaintiffs later agreed to provide authorization for the phone records on November 5, 2024, giving the movants insufficient time to obtain and review them before the summary judgment motion deadline. This Court agrees that the phone records which were previously unavailable to the defendants are not appropriately submitted for the first time in opposition and shall not be considered herein.

Plaintiffs' expert opines that Methodist Hospital failed to have a proper "system" or protocol for following up with patients and advising a physician on whether they have scheduled their tests, but the expert's opinions are conclusory and do not articulate the applicable standard of care. "General and conclusory allegations of medical malpractice . . . unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat" a defendant's prima facie showing in a summary judgment motion (*Gilmore v Mihail*, 174 AD3d 686, 687 [2d Dept 2019]). Plaintiffs present no evidence to counter the movants' prima facie showing, through the Briggs affidavit, email records, and the testimony of Decedent's father, that the hospital made attempts to schedule further cardiac testing by phone and Decedent elected not to return. Therefore, Plaintiffs have not raised a triable issue of fact on this claim, only offered conjecture that the hospital made no attempts to schedule the tests.

14

[* 14]

Finally, on the issue of informed consent, the movants establish as a matter of law that this cause of action cannot be maintained against Dr. Dilmanian or Methodist Hospital. This claim requires an "affirmative violation of physical integrity" and is not applicable to claims that the physician failed to undertake diagnostic tests or treatment (*see S.W. v. Catskill Regional Med. Ctr.*, 211 AD3d 890, 891 [2d Dept. 2022]; Public Health Law § 2805-d [2]).

Plaintiffs do not raise any issue of fact or opposition as to the informed consent claim. Accordingly, the motion is granted in its entirety, and all claims against Dr. Dilmanian and Methodist Hospital are dismissed.

It is hereby:

**ORDERED** that Dr. Dilmanian and Methodist Hospital's motion (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiffs' complaint and any claims against them in this action, is **GRANTED**; and it is further

**ORDERED** that counsel for the remaining parties shall appear for a virtual Settlement Conference on June 5, 2025 at 10:00 a.m. A link will be provided.

The Clerk shall enter judgment in favor of HAJIR DILMANIAN, M.D. and NEW YORK-PRESBYTERIAN BROOKLYN METHODIST HOSPITAL.

This constitutes the decision and order of this Court.

**ENTER.**

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

15

[* 15]