Lopez v City of New York (2021 NY Slip Op 01945)





Lopez v City of New York


2021 NY Slip Op 01945


Decided on March 30, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 30, 2021

Before: Renwick, J.P., Kern, Mazzarelli, Oing, JJ. 


Index No. 7100/07 Appeal No. 13073-13073A Case No. 2020-00966 2020-02607 

[*1]Raoul Lopez, Plaintiff-Respondent,
v
The City of New York, Defendant-Appellant.


James E. Johnson, Corporation Counsel, New York (John Moore of counsel), for appellant.
Brett H. Klein, PLLC, New York (Brett H. Klein of counsel), for respondent.



Judgment, Supreme Court, Bronx County (Fernando Tapia, J.), entered December 5, 2019, upon a jury verdict awarding plaintiff $1.5 million for past pain and suffering, $5 million for future medical expenses (for 35 years), and $4.5 million for future pain and suffering (for 35 years), and appeal therefrom bringing up for review an amended order, same court and Justice, entered on or about May 4, 2020, which denied defendant's motion to vacate the judgment and dismiss the complaint or set aside the verdict and order a new trial on liability and damages, unanimously modified, on the facts, defendant's motion granted to the extent of setting aside the verdict on damages for future medical expenses, and to order a new trial on damages for future medical expenses, unless plaintiff stipulates within 30 days of entry of this order to reduce the award for future medical expenses to $4,289,606.09, and otherwise affirmed, without costs. Appeal from amended order, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.
Defendant City appeals from the denial of its motion to set aside the verdict that held it responsible for a police officer's use of excessive force in shooting plaintiff in the neck during a traffic stop, and assessed damages. The City's principle argument on liability is that the verdict was based on insufficient evidence and that it was against the weight of the evidence. The jury heard two dramatically different versions of the incident. According to plaintiff, he was stopped by two police officers in an unmarked car while he was driving his car shortly after purchasing two bags of heroin on Marcy Place and Grand Concourse. He was pulled over after he made a right turn at a stop sign onto the local lane of the Grand Concourse, after coming to a full stop. Plaintiff testified that officer Philippe Blanchard then approached the driver's side of his car with his gun drawn, and that Blanchard's partner, Zino Konstantinidis, approached the passenger side. Blanchard directed plaintiff to turn the car off and put his hands up, and plaintiff complied. Blanchard then pointed the gun to the back of plaintiff's head, while yelling "let me see your hands, where's the st at?" and "give it to me, give it to me." Plaintiff reached for the heroin, which was in his lap, and handed one bag to Blanchard, but fumbled with and dropped the other bag on the floor. Blanchard directed plaintiff to "pick it up," and as plaintiff reached down to do so, Blanchard shot him. Upon realizing he had been shot, which felt like "a pinch," plaintiff started the car and tried to drive over the median separating the local lane of the Grand Concourse itself, but his body "slumped down" and the car crashed into a planter on the median. Plaintiff stipulated that, as a result of the incident, Konstantinidis "was significantly injured," although the stipulation had no specific information about the nature of the injury or how the officer sustained it. [*2]Plaintiff also presented a witness, a home health aide who was working in an apartment overlooking the Grand Concourse and 169th Street, who testified that she looked out a window and saw a car "slowly rolling" across the local lane of the Grand Concourse, with a policeman on foot on either side of the car, either trying to stop it or get in, before the car struck a planter and stopped.
Blanchard and Konstantinidis testified that they were surveilling the area in an unmarked vehicle near Marcy Place and the Grand Concourse, a drug prone area, when they happened to notice plaintiff's car roll through a stop sign. The officers pulled plaintiff over at the local lane of the Grand Concourse and 169th Street. Blanchard approached the driver's side of plaintiff's car, while Konstantinidis approached the passenger's side. Plaintiff's driver's side window was partially opened. Blanchard had to ask plaintiff to turn off the car three times before plaintiff complied. Plaintiff took the key out of the ignition and put his right hand down at his side. Blanchard told him to keep both hands visible, and after asking three times, began yelling "show me your hands." When Konstantinidis heard Blanchard shouting at plaintiff, he tried opening the passenger side door, but it was locked, so he ran around the front of the car to the driver's side. As he did so, plaintiff restarted the car. When Konstantinidis got to the driver's side, Blanchard was struggling with plaintiff while trying to turn the steering wheel toward the curb to prevent the car from merging into traffic. At some point, he released the steering wheel with his right hand, and grabbed his gun with it. Meanwhile, Konstantinidis went under Blanchard's left arm, and reached his right arm through the driver's side window to grab the keys and turn off the engine. Plaintiff turned the steering wheel, locking Konstantinidis's arm in place, and proceeded into traffic, dragging the officer. Upon seeing his partner being dragged, Blanchard let go of the steering wheel with his left hand, stuck his right hand with the gun through the window, and fired a shot as he ran alongside the car, striking plaintiff in the neck. Blanchard, who had never before fired his weapon while on duty, thought it would be impossible to pull Konstantinidis away from the moving vehicle, and believed Konstantinidis would be killed or seriously injured if he did not act. After the shot, the car proceeded across the local lane of the Grand Concourse, toward the median. It jumped a small concrete barrier and the curb, and hit a large planter, before Blanchard steered it toward a tree. Konstantinidis's arm dislodged at some point before the car hit the planter, and the officer somehow wound up on the passenger side of the car. He surmised that he had walked over while still "disoriented."
Plaintiff's expert medical witness, Dr. William Kulak, testified that the bullet that struck plaintiff did not sever plaintiff's spinal cord but rather [*3]caused a contusion to it. According to Dr. Kulak, a contusion leads to soft tissue swelling known as edema, which squeezes the nerves and impedes their function. However, he explained that it "can take a few seconds" and even up to a minute before nerve function actually stops, during which time a person can still have use of their extremities. The City's expert, Dr. Alan Bender, testified that, if plaintiff had suffered the injuries as described by Dr. Kulak, plaintiff "probably" would not have been able to drive immediately after being shot. However, he agreed with Dr. Kulak that a bullet entering the neck causing a spinal cord contusion could result in a delay in the full effects of the injury.
In conducting a sufficiency of the evidence review, we are required to consider all of the evidence placed before the jury, and determine whether "a valid line of reasoning and permissible inferences could lead rational persons to find" in the way the jury did (Mazella v Beals, 27 NY3d 694, 709 [2016]). We are also required to consider the evidence in a light most favorable to the nonmoving party, plaintiff here, affording him every available inference that can be drawn from the evidence (Szczerbiak v Pilat, 90 NY2d 553, 556 [1997]). The City contends that, even if we were to grant plaintiff such inferences, there is no valid line of reasoning that could have led to a verdict in favor of plaintiff. It argues that because Lopez received a paralyzing shot to the neck, it would have been impossible for him to have driven the car away from the scene after being shot. Thus, the City maintains that the officers' version of events, which involved plaintiff being shot because he was driving the car, is the only one that has logical weight. The City further points to the stipulation about Konstantinidis's injury, and asserts that under Lopez's version of the incident it would not have been possible for the officer to hurt himself "significantly."
We find that the evidence presented by plaintiff was sufficient to support his theory of liability. First, the import of Dr. Kulak's testimony is that, even though plaintiff became paralyzed by the bullet, the paralysis did not necessarily happen immediately. It was scientifically possible that plaintiff retained his mobility during the time that the contusion to his spinal cord evolved into an edema that made it impossible for him to move his arms and legs. An interval of even seconds, which Dr. Kulak testified was possible, was sufficient for plaintiff to place his car in gear and operate it. Further, the home health aide who witnessed the incident testified that both officers were on either side of the car and trying to stop it or get in. This directly contradicted Konstantinidis's testimony that only after the car hit the planter did he somehow move to the passenger side of the car. Further, under the circumstances, the jury could have reasonably imagined a scenario where Konstantinidis hurt himself trying to accomplish [*4]either of those things.
Of course, the analysis does not end there, since the City contends that, even if plaintiff presented sufficient evidence to support the jury's verdict on liability, the verdict was against the weight of the evidence. Under that review, we must consider whether "the evidence so preponderated in favor of the [City] that the verdict could not have been reached on any fair interpretation of the evidence" (Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995][internal quotation marks, brackets and citations omitted]). In arguing that the weight of the evidence preponderated in favor of the City, it argues again that, given plaintiff's gunshot wound, it makes little sense that plaintiff could have operated the car in the manner he did after he sustained the wound. It further reiterates its argument that it was not logical for the jury to conclude that Konstantinidis sustained serious injury from, as the City characterizes it, "simply standing next to the vehicle on the passenger side." The City further argues that it is much more believable that plaintiff, who was transporting drugs and had every incentive to avoid a police encounter, acted in the manner in which he did than that Blanchard, who testified that he had never before fired his weapon in the line of duty, would have approached plaintiff's car with his gun drawn and then shot plaintiff "for absolutely no reason."
We find that the weight of the evidence did not so preponderate in favor of the City so as to warrant vacating the judgment and remanding for a new trial. Again, plaintiff's testimony that he drove the car after the police shot him was supported by medical evidence in the form of Dr. Kulak's testimony that it can take seconds for edema to develop, during which time plaintiff would have retained mobility. Dr. Bender, the medical expert who testified for the City, did not demonstrate in any persuasive way that Dr. Kulak was wrong; to the contrary, he agreed that it was possible that there could be a delay between the moment that the bullet contused the spinal cord and the moment plaintiff lost the ability to use his extremities. Although he opined that plaintiff "probably" lost his ability to drive the moment he was shot, that was insufficient for the jury's assessment of the evidence to be considered incorrect. Indeed, the jury was free to choose whichever of the expert opinions it found the more persuasive (see Aparicio v Goldberg, 94 AD3d 502, 503 [1st Dept 2012]). Similarly, the jury had a rational basis for favoring the evidence presented by plaintiff with respect to Konstantinidis's injury over that presented by the City. While it is certainly possible that the officer could have been injured if the incident had occurred in accordance with the City's version of events, it is not so implausible that he could have hurt himself while trying to stop the car or get in it while he was on the passenger side of the car, which is what the home health aide produced [*5]by plaintiff testified Konstantinidis was doing when she looked out on the scene.
With respect to the City's point that it is implausible that Blanchard would have approached plaintiff's car in such an aggressive manner, and perfectly plausible that plaintiff would have been motivated to flee the scene because of the presence of drugs in the car, we note that the two different versions of the incident were based almost primarily on witness testimony. We cannot discount the possibility that the jury, having observed the officers' recounting of the incident, found them to lack credibility. Determining the credibility of the witnesses was exclusively in the province of the jury, and the jury is entitled to our deference (see Crespo v Chan, 54 AD3d 621 [1st Dept 2008]). In any event, the officers testified that the area where the incident occurred was drug prone, and Blanchard stated that when he is pulling over a drug suspect he sometimes draws his weapon as he approaches the car. This could have provided a basis for the jury to believe plaintiff's version over the officers'. The City further argues that plaintiff's testimony that Blanchard directed him to reach down to retrieve the packet of drugs he had dropped is inconsistent with the notion that Blanchard reacted by shooting him. However, if the jury believed that Blanchard took an unreasonably aggressive posture with plaintiff by approaching with a drawn gun and placing the gun near his head, it was not wholly irrational for the jury to believe that Blanchard's agitated state led him to discharge the weapon even though he had no obvious reason to believe plaintiff was acting in a threatening manner.
For the foregoing reasons, there is no basis to overturn the verdict based on the evidence presented at trial. The City offers two additional arguments for why a new trial is warranted. First, the City contends that the court improperly disposed of its pretrial motion for permission to impeach plaintiff with cross-examination about his 14 prior convictions, to the extent that it allowed cross-examination on only one, for possession of a forged instrument. The nature and extent of cross-examination, however, is subject to the sound discretion of the trial court (see Sehgal v www.nyairportsbus.com, Inc., 153 AD3d 571 [2d Dept 2017]). The court properly exercised that discretion in precluding cross-examination on convictions that were largely related to plaintiff's history of drug addiction, which had little bearing on his credibility. In any event, in contrast to cases like Sansevere v United Parcel Serv. (181 AD2d 521 [1st Dept 1992]), in which the jury had no access to a key witness's criminal history, here the jury heard about the forgery conviction, and knew from plaintiff's own direct testimony that he had purchased drugs immediately before the incident. Accordingly, the jury had sufficient knowledge of the background that the City hoped to present to it. To the extent the City argues that plaintiff's [*6]recent criminal convictions, including one for weapons possession two weeks before the incident, is relevant to his state of mind, and would have supported the officers' testimony by explaining why he would try to flee during a traffic stop, the argument was not raised below and so is unpreserved. In any event, the argument should be rejected, as the very fact of plaintiff's many arrests may have indicated to the jury that he is not inclined to flee the police.
The City also takes issue with the court's refusal to declare a mistrial based on remarks by plaintiff's counsel during summation urging the jury to find for plaintiff in order to "send a message to the City and police officials about 'what we want as a community'." Trial counsel is afforded wide latitude in presenting arguments to a jury on summation (Chappotin v City of New York, 90 AD3d 425, 426 [1st Dept 2011], lv denied 19 NY3d 808 [2012]). However, counsel may not engage in deliberate or persistent efforts to divert the jury's attention from the relevant issues to be determined (Clarke v New York City Tr. Auth., 174 AD2d 268, 278 [1st Dept 1992]). This Court has found, in some circumstances, that implorations to juries to "send a message" are improper (see People v Espada, 205 AD2d 332, 332-333 [1st Dept 1994]). However, as the remarks were isolated comments made in the context of a six-day trial and lengthy summation, they could not have permeated the trial and affected the outcome (see Pareja v City of New York, 49 AD3d 470 [1st Dept 2008]; Binder v Miller, 39 AD3d 387 [1st Dept 2007]).
While we thus see no reason to upset the liability portion of the verdict, we do find that the court erred in upholding the award for future medical expenses. The City argues that the $5 million award for future medical expenses lacks an evidentiary basis because, even accounting for the jury's adjustment of plaintiff's expected lifespan to 35 years from 40.2 years, the amount arbitrarily fell between plaintiff's economist's projected future life care needs of $3,940,012 (at low inflation) and $6,267,204 (at high inflation). It also contends that some of the future medical needs set forth in the life care plan were speculative, as plaintiff had not received such treatment for years before trial. The City argues for a reduction of the award to $2,228,595 (i.e., the amount of the economist's low inflation estimate, minus the costs for treatments plaintiff had not received for years, and adjusted for the jury's determination of his expected lifespan).
A jury award "need not match the expert's assessment exactly," especially where the award was likely based on an age adjustment (see Rivera v Montefiore Med. Ctr., 123 AD3d 424, 427 [1st Dept 2014], affd 28 NY3d 999 [2016]). However, the City has demonstrated that some aspects of the projected future treatment in the life care plan were not necessary. Plaintiff does not dispute that he had not received occupational therapy for more than 10 years, physical [*7]therapy for more than 9 years, treatment from a physiatrist for more than 8 years, epidural injections for more than 4 years, and Percocet for 3 years as of the time of trial; that he had not had an MRI since his initial hospitalization in 2006; and that he had never obtained psychological treatment or used the services of a case manager or home attendant. In addition, plaintiff never explained why he stopped those treatments, and relies only on Dr. Bender's general statement that "[i]n any case where there is an injury like this, it is necessary that you have ongoing care, physical therapy, passive movement, things to keep contractures from happening "
Because the absence of the foregoing treatment for years demonstrates a lack of necessity for such treatment in the future, the jury award as to those projected treatments should be set aside (see Kromah v 2265 Davidson Realty LLC, 169 AD3d 539, 541 [1st Dept 2019];Hyatt v Metro-North Commuter R.R., 16 AD3d 218, 219 [1st Dept 2005]). However, in view of plaintiff's proof that he had been taking Neurontin instead of Percocet, which is similar in price, the award for future need for painkillers should remain. Further, because defendant has not offered a basis for disturbing the jury's award of damages for future medical expenses in an amount based on a high-inflation projection by plaintiff's economist, we have recalculated the award based on that figure, adjusted for age ($6,267,204 - $2,186,130 + $845,845) x (35/40.2) = $4,289,606.09.
Finally, we find that the damages awarded for past and future pain and suffering do not materially deviate from what has been considered reasonable compensation (see CPLR 5501[c]; Gregware v City of New York, 132 AD3d 51, 62-63 [1st Dept 2015]; Miraglia v H & L Holding Corp., 36 AD3d 456 [1st Dept 2007], lv denied 10 NY3d 703 [2008]; Ruby v Budget Rent A Car Corp., 23 AD3d 257 [1st Dept 2005], lv denied 6 NY3d 712 [2006]).
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 30, 2021