Rozon v Schottenstein (2022 NY Slip Op 01278)





Rozon v Schottenstein


2022 NY Slip Op 01278


Decided on March 01, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 01, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
Angela M. Mazzarelli Anil C. Singh Manuel Mendez John R. Higgitt


Index No. 805014/16 Appeal No. 14777 Case No. 2020-04996 

[*1]Carola Rozon, Plaintiff-Respondent,
v
Edwin M. Schottenstein, M.D., Defendant-Appellant.



Defendant appeals from the order of Supreme Court, New York County (Eileen A. Rakower, J.) entered on or about April 21, 2020, which denied defendant's CPLR 4404 (a) motion to set aside the jury verdict and enter judgment in his favor or order a new trial.




Ekblom & Partners, LLP, New York (Neil H. Ekblom and Hillary C. Agins of counsel), for appellant.
Pollack, Pollack, Isaac & DeCicco, LLP, New York (Brian J. Isaac and Paul H. Seidenstock of counsel), for respondent.



MENDEZ, J. 


Plaintiff sued defendant, an ophthalmological surgeon who specializes in the eye's anterior chamber,[FN1] for medical malpractice to recover for injury to her right eye caused by defendant's negligence while performing cataract removal and lens replacement surgery on December 31, 2013. Plaintiff alleges that as a result of defendant's malpractice in removing a six-millimeter Intra-Ocular Lens (IOL) through a 2.75-millimeter incision and the resultant excessive manipulation of the eyeball, she sustained a retinal tear, which developed into a giant retinal tear and retinal detachment, and eventually became legally blind in her right eye.
Defendant had previously performed a successful cataract removal and lens replacement surgery on plaintiff's left eye on July 16, 2013. As in the previous cataract removal and lens replacement surgery, the December 31, 2013 surgery was performed using phacoemulsification, a technique by which the tip of an ultrasonic machine, a phaco probe, is inserted into the lens through a small incision in the anterior chamber. The machine's vibrations break up the hard, inner portion of the lens (nucleus) that is affected by the cataract and then the lens is extracted with irrigation and suction, leaving the capsular bag [FN2] filled with fluid.
Defendant initiated plaintiff's surgery by making a 2.75-millimeter incision in the anterior chamber. He successfully removed most of the nucleus of the cataract lens using phacoemulsification, but two complications arose during the surgery: (1) the bottom of the capsular bag tore and (2) a piece of the lens dropped through the tear into the back of the eye, eventually requiring that a vitreoretinal surgeon [FN3] remove it.
After those complications defendant injected a folded six-millimeter IOL into plaintiff's eye, but it was off-center and displaced towards the back, and he decided to remove it by using a holding forceps (instead of a folding forceps) and pulling the unfolded six-millimeter IOL through the same 2.75-millimeter incision he had made to insert it. The incision was not enlarged to the size of the six-millimeter IOL.
Defendant did not immediately obtain the assistance of a vitreoretinal surgeon to address the complications that arose during the surgery because it was late on New Year's Eve. Therefore, on January 2, 2014, two days after the surgery, defendant referred plaintiff to a vitreoretinal surgeon for removal of the dropped piece of lens and placement of the IOL from the back of the eye[*2]. On that day the vitreoretinal surgeon examined her and noted signs of trauma to the eye, including corneal edema and blood from a vitreous hemorrhage. Importantly, neither defendant nor the vitreoretinal surgeon noted any injury to the iris. The vitreoretinal surgeon was unable to visualize the back of the eye because of the vitreous hemorrhage and used a B-scan ultrasound [FN4] to create an image of the back of the eye so he could determine if there were any retinal tears. According to the vitreoretinal surgeon the B-scan ultrasound did not detect any retinal tears. Therefore he scheduled a follow-up appointment for the following week.
On January 9, 2014, there was still blood in the eye from the vitreous hemorrhage, but the vitreoretinal surgeon did not perform another B-scan ultrasound. He stated that with the use of a fundoscope he was able to see well enough to the back of the eye, saw the piece of lens that had fallen - but did not see a tear or a giant retinal tear - and scheduled surgery for January 15, 2014.
During that surgery the vitreoretinal surgeon, whose goals were to remove the blood remaining in the vitreous fluid, remove the fallen piece of lens and insert an IOL, noted a choroidal effusion [FN5] that necessarily had to be drained. Once the choroidal effusion was drained, he visualized a superiorly placed (top of the eye) giant retinal tear and retinal detachment, which he attempted to repair. The vitreoretinal surgeon performed five additional unsuccessful surgeries on plaintiff's eye to repair the giant retinal tear and retinal detachment over the course of a year. Ultimately, she lost the vision in her right eye.
This malpractice action was commenced on January 7, 2016 and the jury trial took place between November 12 and November 26, 2019. At trial, plaintiff presented as her expert an ophthalmological surgeon, who opined that the removal of the six-millimeter IOL through the 2.75-millimeter incision, and the related manipulations of plaintiff's eye, caused trauma that substantially increased the risk of, and was the cause of a retinal tear with a subsequent retinal detachment. He further opined that the vitreous hemorrhage and corneal edema visualized on January 2 by the vitreoretinal surgeon is proof of the trauma to plaintiff's eye and the injury to plaintiff's retina, and was caused by the negligence of defendant.
Plaintiff's expert opined that the excessive manipulation of the eye in removing the six-millimeter IOL through a 2.75-millimeter incision caused a small superiorly placed retinal tear which was not visualized by defendant at the end of the New Year's Eve surgery because he was not looking at that part of her eye; that the vitreoretinal surgeon also did not visualize the small retinal tear on January 2 or January 9; and that this tear gradually grew to become the giant retinal tear visualized by the vitreoretinal surgeon during the January 15 surgery.
Plaintiff's expert further opined that the vitreoretinal surgeon [*3]would not have been able to see a small retinal tear on January 2, because the B-scan ultrasound is generally not used to diagnose retinal tears, and they cannot be seen on B-scan ultrasounds. He opined that to see a retinal tear using a B-scan ultrasound the situation would have to be ideal and near perfect, with an experienced retinologist looking for it. He testified that a B-scan ultrasound is only effective at identifying giant retinal tears, and the larger the tear the more likely the displacement of tissue, making it easier to see. As to January 9, plaintiff's expert stated that a small superiorly placed retinal tear would not have been visualized because there was still vitreous hemorrhage in plaintiff's eye and the primary focus of the vitreoretinal surgeon was the back of plaintiff's eye to look for the fallen piece of lens, not looking at the top of her eye for a retinal tear. He opined that retinal detachment occurred at some point after the retinal tear and could have happened during the period between January 9 and its discovery on January 15.
The vitreoretinal surgeon testified - on behalf of defendant - that due to the vitreous hemorrhage, his ability to see to the back of the eye was hampered on January 2, therefore a B-scan ultrasound was performed, and no retinal tears were visualized. He conceded that the B-scan ultrasound he performed on January 2 was not an effective way to visualize small retinal tears, particularly those that have not moved and are in the superior position. He also conceded that retinal tears are more difficult to pick up than retinal detachments on a B-scan ultrasound. However, on January 9 a B-scan ultrasound was not necessary because with the use of a fundoscope, looking through the small opening in the pupil, and although there was still blood in plaintiff's eye, he was able to see the piece of lens that had fallen to the back of the eye, was able to visualize the retina and would have seen any giant retinal tear if one existed. If he was not able to visualize the retina, he would have done a B-scan ultrasound.
The vitreoretinal surgeon testified that he did not know how the giant retinal tear and retinal detachment occurred between January 9 and January 15, and although he claimed to have a theory about the cause, he did not state it. He only said something must have happened that caused plaintiff's eye pressure to drop, although she had not reported any recent trauma to the eye other than the surgery of December 31, 2013.
Defendant presented two additional expert witnesses, a vitreoretinal surgeon and an ophthalmological surgeon. Defendant's vitreoretinal expert testified that retinal tears that are tractional in origin will typically have a flap of the retina that can be visualized as a small indentation on a B-scan ultrasound; however, a retinal tear with no flap would not be picked up by the B-scan ultrasound. Defendant's expert ophthalmological surgeon testified that if vitreous fluid pulled [*4]into the anterior chamber were not a strand but just a blob that was not big enough to distort the pupil, it is not likely for a retinal tear to have been visible to defendant or to the vitreoretinal surgeon on either January 2nd or January 9th.
Defendant appeals from an order, which denied his post trial CPLR 4404(a) motion to set aside the jury's verdict and for judgment in his favor or for a new trial. In denying defendant's motion, Supreme Court found there existed a valid line of reasoning and permissible inferences that could possibly lead a rational person to the conclusion that defendant committed malpractice, and the malpractice was the cause of plaintiff's injuries. Supreme Court further determined that the opinion of plaintiff's expert reflected an acceptable level of certainty and that the disputed testimony and evidence raised issues that were properly addressed by the jury. We agree and therefore affirm.
In a medical malpractice action, the plaintiff is required to show that the defendant deviated from acceptable medical practice, and that the deviation is the proximate cause of her injuries. A defendant's negligence is the proximate cause when it is a substantial factor in the events that produced the injury (see Mazella v Beals, 27 NY3d 694, 706 [2016]).
Defendant argues that plaintiff's expert testified on re-cross that he would defer to the vitreoretinal surgeon as to what he saw on January 9th, and the vitreoretinal surgeon testified that on that day he was able to see the retina with the use of a fundoscope - even though there was still blood in the vitreous cavity of the eye - and there was no giant retinal tear. However, that testimony alone is not dispositive of the issues in this trial and has been taken out of context. Importantly, the expert's testimony preceding this answer casts doubt on the accuracy of the vitreoretinal surgeon's record-keeping, and the thoroughness and accuracy of the examination performed on January 9. Due to the lack of checkoffs and other omissions in the notes, he disagrees that they indicate a full examination of the eye was done on January 9, and disagrees with the premise that if the vitreoretinal surgeon did not do a B-scan ultrasound on this date it meant he had no difficulty looking at the retina. He testified that the vitreous hemorrhage would have obscured the vitreoretinal surgeon's ability to visualize the retina on January 2 and January 9, and that on January 9 the vitreoretinal surgeon was not focused on a small retinal tear.
The vitreoretinal surgeon's testimony that he could have seen well enough should be considered with the totality of the evidence introduced. On direct examination the vitreoretinal surgeon was asked about potential causes that would block his view of the retina. He testified in relevant part, "If there is some substance inside between the iris and the cornea you can't see behind it; If the pupil is not big enough, you'll see but not very much . . . If there [*5]is anything in the vitreous, most commonly blood you won't be able to see the retina." The jury, which is in the best position to assess the credibility of the witnesses, is entitled to assess his credibility and decide what weight it will give to his testimony (Delgado v Murray, 115 AD3d 417 [1st Dept 2014]; Uygur v Superior Walls of Hudson Val., Inc., 35 AD3d 447, 448 [2d Dept 2006]). Great deference is accorded to the factfinders, who had the opportunity to see and hear the witnesses (Bobek v Crystal, 291 AD2d 521 [2d Dept 2002], lv denied 100 NY2d 505 [2003]; Corcoran v People's Ambulette Service, 23 AD2d 402 [2d Dept 1997]).
It is undisputed that on January 2, 2014, the vitreoretinal surgeon was unable to look into the back of the eye because there was blood in the vitreous cavity. Therefore he did a B-scan ultrasound. All the experts agree that a B-scan ultrasound is limited in its ability to visualize a small retinal tear. It can visualize a giant retinal tear if one exists and it may be able to visualize a small retinal tear that has a flap (horseshoe tear); however, if the small tear does not have a flap the B-scan ultrasound has difficulty detecting it.
On January 9, 2014 the vitreoretinal surgeon looked into the back of the eye using a fundoscope and because he could see into the back of the eye, he felt there was no need to perform a B-scan ultrasound on this day. He noted that there was still blood in the eye but stated that he could see well enough because he could see a piece of the dislocated lens and "only if he had not been able to see 'any part' of the retina would he have done an ultrasound that day." He was content with seeing "a part" of the retina, especially the part where the dislocated lens had fallen.
However, the retinal tear was not located in the back of the eye, it was located in the superior front portion of the eyeball, and according to defendant's vitreoretinal expert
"the iris would block the ability of the doctor to see the very far
peripheral retina. So what the doctor would do is press on the white
of the eye, on the sclera, to indent the sclera such that the retina can
now be visualized through the pupil. . .because of the narrowing of the
pupil looking at the top is difficult to see if doing nothing more. . .if
the patient is in pain, it is difficult to do the exam by pressing on the
patient's eyeball to visualize the peripheral retina."
For the vitreoretinal surgeon to have seen the small retinal tear using a fundoscope he would have had to press on the top portion of the eye to bring it into view of the fundoscope. Performing this exam would have been difficult, uncomfortable and very painful, especially with a patient who was complaining of 8-to-9 out of 10 pain in the eye due to the recent surgery. Indeed, the pain was so severe that she said, "it felt like a spike going through her eye."
Of interest is the vitreoretinal surgeon's description of a retinal tear and [*6]of a giant retinal tear. His description is consistent with plaintiff's theory and explains how a small tear developed into a giant retinal tear. The vitreoretinal surgeon explained that "a retinal tear and a giant retinal tear are not the same thing. A retinal tear is a horseshoe tear and a giant retinal tear is an unzipping of the retina. It starts out with one little area and then the whole thing unzips, which you never see with a horseshoe tear." Precisely what plaintiff's expert says occurred here, there was a small tear that was not visualized by the defendant during the surgery, or by the vitreoretinal surgeon on January 2 or January 9 (because it was not a horseshoe tear), which unzipped and by January 15 had developed into a giant retinal tear and detachment.
All parties agree there was no giant retinal tear on January 2 or January 9. If there had been one the B-scan ultrasound would have visualized it on January 2, or the vitreoretinal surgeon could have visualized it on January 9. Plaintiff's theory is not that there was always a giant retinal tear. Her theory is that initially there was a small tear. As proof she points to the vitreous hemorrhage.
The experts narrowed the source of the hemorrhage to a couple of different theories: plaintiff's expert said the source was a retinal tear; defendant's vitreoretinal expert initially said the blood could come from a retinal tear, from the cataract incision or from a choroidal effusion. On redirect he changed his testimony and said the most likely source of the blood was the iris. However, neither defendant's records nor the vitreoretinal surgeon's records show any damage to the iris, nor, according to defendant's vitreoretinal expert, did anyone ever visualize any damage to the iris or any hemorrhaging of the iris during defendant's surgery or the vitreoretinal surgeon's exams. Every record shows the iris to be round and normal.
Whether the hemorrhage came from a small retinal tear or from the iris was a question for the jury to decide. There was a vitreous hemorrhage on January 2 and the source of the blood was either a small retinal tear or the iris, and there was no damage to the iris. Accordingly, there was a valid line of reasoning for the jury's conclusion that the source of the blood was a small retinal tear, that the small retinal tear existed on the date of the surgery, was not seen by the vitreoretinal surgeon on January 2 or January 9 and progressed to the point that on January 15 it had developed into a giant retinal tear. A jury may entirely reject the testimony of experts; and the credibility of such witnesses, the weight and sufficiency of their evidence are for the jury, and not for the court, to decide (Lipson v Bradford Dyeing Assn of U.S.A., 266 App Div 595, 597 [1st Dept 1943]).
The vitreoretinal surgeon was unable to identify the cause of the giant retinal tear that suddenly appeared during the surgery on January 15, 2014, either because he could not, or because [*7]he did not want to. Ultimately, he stated that he believed something, no one knows what, caused a drop in the eye pressure. He did not say what he thought was the cause of the giant retinal tear because "it would be sheer speculation on his part." If there was a retinal tear the vitreoretinal surgeon should have detected it sooner rather than later to prevent, as occurred here, any tear from progressing into a giant retinal tear and detachment, with attendant complications for the plaintiff. At the end of the trial, despite the vitreoretinal surgeon's testimony, the defendant blamed him for plaintiff's current condition.
The jury need not consider solely the vitreoretinal surgeon's testimony. It is entitled to consider his testimony together with the testimony of the other witnesses and all the other evidence in the case (High Value Trading LLC, v Shaoul, 168 AD3d 641, 642 [1st Dept 2019], lv denied 22 NY3d 910 [2019]).
The documentary evidence and the testimony of all the experts created factual and credibility issues that were properly determined by the jury (Rose v Conte, 107 AD3d 481 [1st Dept 2013]; Torricelli v Pisacano, 9 AD3d 291 [1st Dept 2004] lv denied 3 NY3d 612 [2004]). If the resolution of the case turns on the evaluation of conflicting testimony of expert witnesses, the resolution of such a conflict rests with the jury and not the court (McDermott v Coffee Beanery, Ltd., 9 AD3d 195, 207 [1st Dept 2004]). The conclusions reached by the jury should not be overturned as against the weight of the evidence unless "there is simply no valid line of reasoning, and permissible inferences which could possibly lead rational people to the conclusion reached by the jury" (Cohen v Hallmark Cards, 45 NY 2d 493, 499 [1978]).
To be against the weight of the evidence, a verdict must be palpably wrong (Lolik v Big V Supermarkets, 86 NY2d 744 [1995]; Douayi v Carissimi, 138 AD3d 410 [1st Dept 2016]). In this case, we cannot say the verdict is palpably wrong. The jury found that plaintiff's injuries were proximately caused by defendant. They deemed the testimony of plaintiff's expert, when considered with the documentary evidence and all the other evidence in the case, more credible than the testimony of the vitreoretinal surgeon, and defendant's expert witnesses. The differing testimony and conclusions on causation given by defendant's witnesses do not require a different outcome. In the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict (McDermott v Coffee Beanery, Ltd, 9 AD3d at 206).
We have considered defendant's remaining arguments as to causation, departure from the standard of care, and notice under CPLR 3101(d), and find them unavailing.
Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.) entered on or about April 21, 2020, which denied defendant's CPLR 4404 (a) motion to set aside the jury verdict and enter [*8]judgment in his favor or order a new trial should be affirmed, without costs.
Order, Supreme Court, New York County (Eileen A. Rakower, J.) entered April 21, 2020, affirmed, without costs.
Opinion by Mendez, J.P., All concur.
Renwick, J.P., Mazzarelli, Singh, Mendez, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 1, 2022



Footnotes

Footnote 1: Front of the eye.

Footnote 2: Outer layer or shell that holds the lens.

Footnote 3: An ophthalmological surgeon specializing in the back of the eye.

Footnote 4: B-scan ultrasound uses sound waves emitted from a probe to create an image of an object in the eye that might otherwise be hidden. The sound waves bounce back when they hit an object and create an image on a screen.

Footnote 5: Swelling of the blood vessels that feed the retina.