Cota v Adirondack Med. Ctr. (2025 NY Slip Op 07256)

Cota v Adirondack Med. Ctr.

2025 NY Slip Op 07256

Decided on December 24, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 24, 2025

CV-24-1197
[*1]Amie Cota, Respondent,
vAdirondack Medical Center et al., Appellants, et al., Defendant.

Calendar Date:October 7, 2025

Before:Garry, P.J., Ceresia, Fisher and Mackey, JJ.; Aarons, J., vouched in.

O'Connor, O'Connor, Bresee & First, PC, Albany (Samantha V. Vedder of counsel), for Adirondack Medical Center, appellant.
Sugarman Law Firm, LLP, Syracuse (Mikayla J. Barrett of counsel), for Matthew Smith, appellant.
Bottar Law, PLLC, Syracuse (Samantha C. Riggi of counsel), for respondent.

Mackey, J.
Appeal from an order of the Supreme Court (Mary Farley, J.), entered June 13, 2024 in St. Lawrence County, which, among other things, (1) denied a motion by defendant Adirondack Medical Center for summary judgment dismissing the complaint against it, and (2) partially denied defendant Matthew Smith's motion for summary judgment dismissing the complaint against him.
In the early morning of January 15, 2017, plaintiff was admitted to defendant Adirondack Medical Center (hereinafter AMC) in active labor. There, less than two hours later, she gave birth to a healthy infant without the use of pain medications or the need for other interventions. Approximately two hours later, plaintiff sought to leave her hospital bed for the first time to use the restroom. Plaintiff and her nurse differ in their recollections as to the degree to which plaintiff was provided and/or accepted assistance and direction in walking to and from the restroom. It is undisputed, however, that plaintiff experienced a syncopal episode after exiting the restroom and that she awoke on the ground with the nurse on top of her. No related diagnostic imaging was performed prior to plaintiff being discharged the next day.
Following her discharge, plaintiff obtained a CT scan of her lumbar spine at a local emergency room, which did not reveal any fracture or dislocation, and she was prescribed nonsteroidal anti-inflammatory drugs, ice and cushion support for a sacral contusion. Her primary care physician continued to manage her treatment thereafter but ordered additional imaging to be performed. On March 15, 2017, plaintiff underwent an MRI at Canton Potsdam Hospital, which was found to be unremarkable by defendant Matthew Smith, a radiologist employed by defendant St. Lawrence Radiology Associates, P.C.[FN1] Based upon Smith's reading, plaintiff's primary care physician subsequently prescribed her a course of physical therapy. Plaintiff later reported that certain aspects of the prescribed physical therapy, such as manual manipulation, were extraordinarily painful and that, despite gaining some relief from certain aspects of the therapy, she had continuing discomfort.
On May 5, 2017, plaintiff met with a tailbone specialist, who diagnosed her with a compression fracture of her coccyx, performed certain pain management injections and continued her existing treatment, but discontinued her previously prescribed physical therapy. In addition to ordering new imaging, the specialist undertook an independent review of plaintiff's prior imaging and concluded that the March 2017 MRI clearly revealed her coccyx fracture. It was later discovered that certain views of that MRI, including those that revealed the fracture, were uploaded into the system utilized by Smith in an allegedly improper manner. Plaintiff thereafter sought the services of a spinal surgeon, who performed a coccygectomy — removal of the coccyx — in September 2017.
Plaintiff ultimately commenced medical malpractice actions against [*2]AMC and Smith, among others, essentially alleging that AMC failed to prevent and respond to her fall, and that Smith failed to properly diagnose her fracture, each thereby causing and/or exacerbating her injury. Following joinder of issue, consolidation of the actions and discovery, AMC and Smith separately moved for summary judgment dismissing the complaint against them. Plaintiff opposed. Supreme Court denied AMC's motion in its entirety and generally denied Smith's motion except as to certain allegations not at issue here. AMC and Smith separately appeal.
To prevail in a medical malpractice action, a plaintiff must ultimately show that the defendants deviated from acceptable medical practice and that such deviations were a proximate cause of the plaintiff's injury (see Mazella v Beals, 27 NY3d 694, 705 [2016]; Matney v Boyle, 237 AD3d 1382, 1383 [3d Dept 2025]). Accordingly, a defendant moving for summary judgment bears the initial burden to establish that it did not deviate from the accepted standards of practice or, if it did, that any such deviation was not a proximate cause of the plaintiff's injuries (see Schultz v Albany Med. Ctr. Hosp., 238 AD3d 1286, 1288 [3d Dept 2025]; Naylor v Ellis Hosp., 235 AD3d 1130, 1131 [3d Dept 2025]). If that initial burden is met, the burden shifts to the plaintiff to raise triable issues of material fact in opposition (see Sovocool v Cortland Regional Med. Ctr., 218 AD3d 947, 950 [3d Dept 2023]; Schwenzfeier v St. Peter's Health Partners, 213 AD3d 1077, 1080 [3d Dept 2023]).
Addressing first AMC's motion, AMC submitted the expert affidavits of a physician certified in obstetrics and gynecology and a certified registered nurse. With respect to preventing plaintiff's injury, both experts opined that plaintiff's fall risk was properly assessed to be low upon her admission, while acknowledging that AMC's policy nevertheless required that she be observed while ambulating. It also is not disputed that the standard of care for supporting postpartum mothers to the restroom for the first time after delivery requires a one-person assist to be present. As noted above, AMC's submissions reveal that there is a factual dispute surrounding the assistance and directions provided by plaintiff's nurse. AMC's experts, however, viewed any such discrepancies as irrelevant given that the nurse generally remained in the vicinity of plaintiff as a stand-by assist, comporting with the standard of care and internal policy. Although medical records reveal that plaintiff reported being shaky and nauseated shortly before her fall, the AMC experts attributed those symptoms to routine hormone regulation following childbirth. Finding her vitals to be normal and pointing to the absence of an epidural, cesarean section, significant blood loss, or lack of sleep, both experts also opined that there were no factors present that should have caused plaintiff's nurse to anticipate a syncopal episode or fall, or to otherwise deviate from the orders [*3]that plaintiff was free to ambulate one hour after having given birth. AMC's experts further agreed that plaintiff's ambulation in contravention of the nurse's directions was the cause of her fall, and that her noncompliance could not have been prevented by additional precautions. The physician expert also offered that plaintiff's labor and delivery, not her fall, likely caused her coccyx fracture, given the baby's occiput posterior positioning and the relatively fast delivery process for this first-time mother. As to AMC's response to the fall, AMC's physician expert initially found that there was no documentation that plaintiff complained of pain to her tailbone following her fall. However, the nurse's notes submitted by AMC make clear that plaintiff reported tailbone soreness after falling. Nevertheless, relying on plaintiff's ability to sit up in bed within the hour after her fall, her subsequent ambulation without incident or complaint, and the absence of bruising or point tenderness upon examination of her back the next day, the physician expert concluded that there was no deviation in the standard of care in declining to order imaging prior to discharging plaintiff. The foregoing proof was sufficient to establish prima facie entitlement to judgment as a matter of law with respect to both AMC's fall prevention and diagnostic efforts, thus shifting the burden to plaintiff (see Schultz v Albany Med. Ctr. Hosp., 238 AD3d at 1288-1289; Naylor v Ellis Hosp., 235 AD3d at 1133).
In opposition, plaintiff proffered the expert affidavits of a physician and nurse with comparable qualifications. Both experts initially opined that the occiput posterior position of plaintiff's baby alone would not have increased her risk of coccyx bruising, let alone fracture, and that the other circumstances necessary for such increased risk, including high birth weight and prolonged labor, were not present here. Citing to plaintiff's complaints of dizziness and nausea, plaintiff's experts opined that she was experiencing fluid volume deficit; hospital notes subsequent to the fall indeed reflect a possible nursing diagnosis to that effect. Relying on plaintiff's complaints, the existence of fluid volume deficit and a perceived spike in her baseline blood pressure just prior to the fall, plaintiff's experts concluded that she was at an increased risk of falls. Given that increased risk, the experts viewed the assistance provided by plaintiff's nurse to have fallen below the standard of care, which, they opined, required the nurse to walk beside plaintiff at all times with one arm behind her and one arm in front of her. Plaintiff's experts concluded that such positioning should have prevented and/or helped better brace plaintiff's fall insofar as the nurse would not have needed to perform the more dramatic maneuvering that she did, which created unnecessary additional momentum for the fall and resulted in the nurse falling on top of plaintiff. Both also agreed that, given [*4]plaintiff's complaint of tailbone soreness following the fall, the standard of care required diagnostic imaging be ordered. Viewing the evidence in a light most favorable to plaintiff and according her the benefit of every reasonable inference from the record proof (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), we agree with Supreme Court's assessment of the issues of fact that remain (see Naylor v Ellis Hosp., 235 AD3d at 1133-1134).
We turn next to Smith's motion for summary judgment, which was dedicated to causation. The thrust of plaintiff's complaint against Smith is that his misdiagnosis of her condition resulted in a delay in her receiving proper treatment for her coccyx fracture and also caused her to undergo painful and inappropriate physical therapy.[FN2] Inasmuch as plaintiff did not submit an expert affidavit in this regard, the issue on appeal as it relates to Smith is whether he met his initial burden of demonstrating that his misdiagnosis did not cause plaintiff any harm. We find that he failed to do so. In support of his motion, Smith submitted the expert affidavit of a board certified orthopedic surgeon with a subspecialty in the spine, who opined that Smith's failure to diagnose plaintiff's coccyx fracture had no impact on her outcome or recommended course of treatment. However, an expert affidavit in a medical malpractice case is conclusory and legally insufficient where it ignores important medical records (see Carlton v St. Barnabas Hosp., 91 AD3d 561, 562 [1st Dept 2012]), is based on an incorrect understanding of the facts (see Micciola v Sacchi, 36 AD3d 869, 871 [2d Dept 2007]), or does not adequately explain the expert's reasoning (see Guthier v DiPreta, 234 AD3d 1166, 1167 [3d Dept 2025]). Smith's expert's affidavit fails in all of these ways.
First, although the expert notes that plaintiff underwent a course of physical therapy, he fails to mention what therapeutic modalities were employed, let alone explain how each of those modalities was appropriate or beneficial to plaintiff. Among other things, the physical therapist performed manual manipulation of plaintiff's coccyx, which caused plaintiff to feel "popping" in her tailbone and elicited "exquisite" pain. The therapist also performed "[k]ineseotaping to the [sacrum] to assist in drawing coccyx back into flexion," which procedure also caused significant pain. Smith's expert makes no attempt to explain how either of these procedures, or any others employed by the physical therapist, were appropriate in treating plaintiff's coccyx fracture. Although the expert details various "[c]onservative methods" that may be appropriate to treat coccydynia (i.e., coccyx pain) "generally," he does not explain how any of the specific therapeutic modalities employed here would be appropriate in the treatment of a coccyx fracture. This failure is underscored by the expert's own affidavit, where he lists a variety of potential therapeutic modalities, but hedges that they may [*5]be attempted "if deemed appropriate" (emphasis added). Missing from his opinion is any explanation as to how those various modalities would be appropriate to treat plaintiff's fracture. Notably, when plaintiff's fracture was ultimately diagnosed, her treating physician immediately ordered that physical therapy be discontinued.
Relatedly, Smith's expert appears to have ignored important medical records. Among other things, he does not state whether he actually viewed the MRI film showing plaintiff's fracture, instead advising in curiously vague fashion that he reviewed "available imaging" (emphasis added), without elaboration or explanation. More importantly, although he claims to have reviewed plaintiff's "medical records," there is nothing in his affidavit to indicate that he understood what modalities the physical therapist employed. Whether this was an oversight by the expert, or a deliberate choice, is immaterial. Regardless of the explanation, the details of plaintiff's physical therapy records — which are the essence of plaintiff's claim against Smith — are simply ignored.
Finally, the expert's affidavit demonstrates either an incorrect understanding, or intentional misrepresentation, of critical facts, suggesting that any delay in plaintiff's surgery caused by Smith's misdiagnosis is of no moment because, he claims, the surgery did not improve plaintiff's condition. Citing plaintiff's testimony that "almost four years [after the surgery] . . . I don't see improvement," he concludes that "[p]laintiff's outcome would not have been improved or altered had the coccygectomy been recommended and performed at an earlier point in time." The expert ignores plaintiff's testimony that, postsurgery, her pain is "[m]ore tolerable. Not excruciating anymore" and that she has been able to return to full-time work as a dental hygienist. She contrasts this with her presurgery condition where she "was in excruciating lower back tailbone pain. Couldn't sit. Couldn't stand. Couldn't lay in my bed. Couldn't wear underwear." She explains how, presurgery, she "couldn't do anything." When read in context, the testimony quoted by the expert does not support his conclusion that the surgery failed to improve plaintiff's condition. Rather, her testimony makes clear that the surgery gave her significant relief but that, some four years postsurgery, she was not experiencing further improvement to her remaining symptoms. In summary, the expert's affidavit was based upon a misunderstanding or misrepresentation of the facts.
The foregoing failures render the expert's affidavit manifestly conclusory and, accordingly, it was insufficient for Smith to shift the burden to plaintiff on summary judgment (see Pullman v Silverman, 28 NY3d 1060, 1062 [2016]; Mylar v Niagara Falls Mem. Med. Ctr., 234 AD3d 1262, 1264-1265 [4th Dept 2025]; Hoffman v Taubel, 208 AD3d 1099, 1100 [1st Dept 2022]). At a minimum, the expert's affidavit is subject to differing interpretations and does not [*6]support granting Smith the "drastic remedy" of summary judgment (Matter of McNeil, 233 AD3d 1231, 1233 [3d Dept 2024]; see Berkeley v Rensselaer Polytechnic Inst., 289 AD2d 690, 692 [3d Dept 2001]). The parties' remaining contentions, to the extent not expressly addressed herein, have been reviewed and determined to be without merit.
Aarons and Fisher, JJ., concur.
Garry, P.J. (concurring in part and dissenting in part).
Neither plaintiff's complaint against defendant Matthew Smith nor her response to his demand for a bill of particulars articulates any claim based upon inappropriate physical therapy. This theory appears to have been introduced — cursorily — in plaintiff's memorandum of law submitted in opposition to Smith's motion. The majority accepts that argument in finding that Smith did not meet his prima facie burden. We find the examination of Smith's proof in that respect to be unduly exacting. The opinion of Smith's expert has a sound basis and was sufficient to shift the burden to plaintiff to refute the medical opinion regarding causation. Plaintiff failed to offer any medical evidence at all, and she accordingly failed to meet her burden. Smith's motion should have thus been granted in full, and we therefore respectfully dissent in part.
It first bears emphasis that the unrefuted medical evidence establishes that the injury in this case is somewhat unique in that the etiology of a patient's pain has no real bearing upon that patient's treatment. Smith's expert, a board certified orthopedic surgeon with a subspecialty in the spine, explained this following his review of plaintiff's medical records and available imaging from, among several other institutions, defendant Adirondack Medical Center and Canton Potsdam Hospital, as well as pertinent deposition testimony. He opined that Smith's alleged failure to diagnose plaintiff's coccyx fracture had no impact on her recommended course of treatment or her outcome. He elaborated, at length, that the etiology of tailbone pain generally does not change the recommended course of treatment and that, in virtually all cases, the treatment is to proceed with an exhaustive course of conservative treatment, including nonsteroidal anti-inflammatory drugs, cushions to relieve pressure on the coccyx, prolonged rest, and the application of ice and/or heat. If those methods are not effective in relieving pain, additional nonoperative modalities will be recommended. Those modalities include pelvic floor rehabilitation, massage therapy, nerve stimulation and — notably, in light of the majority opinion — manual manipulation.[FN3] Put another way, the expert stated that manual manipulation is part of the standard of care for tailbone pain, even when the source of that pain is a fracture.
The majority's assertion that this opinion is equivocal is belied by the expert's subsequent conclusion that, based on the foregoing, plaintiff's course of treatment between March 15, 2017 and May 5, 2017 — including physical [*7]therapy — would not have been any different had Smith timely diagnosed her fracture as she was "appropriately advancing through a progressive course of conservative methods which had not yet been exhausted at the time the coccyx fracture was discovered" (emphasis added). Contrary to the inference being drawn by the majority, the record contains no rationale whatsoever for the fact that plaintiff's tailbone specialist omitted physical therapy from her treatment plan "at this time." What the record does reveal is that, even after her fracture was identified by the specialist, he recommended and performed additional nonsurgical treatment — consistent with the standard of care articulated by Smith's expert. The notes of plaintiff's physical therapist also reflect that plaintiff's primary care physician decided not to order additional imaging after the inconclusive 2017 MRI because "[h]e is anticipating even if there is a fracture he would not change the course of treatment."
The majority highlights plaintiff's deposition testimony that her physical therapist could hear and feel bones popping while manually manipulating plaintiff's tailbone area — notably while electing to continue with said manipulation. However, plaintiff also stated that she experienced that popping sensation literally "all the time" — not only during certain physical therapy procedures or exercises. Even if some aspect of physical therapy caused plaintiff more discomfort than others,[FN4] Smith was not required to precisely itemize physical therapy techniques in any greater detail than was provided. This is, again, underscored by considering that this theory of recovery premised upon painful or inappropriate physical therapy has no footing in the pleadings. Had there been some allegation in a pleading or bill of particulars that kineseotaping, or some other physical therapy exercise or movement, was medically unwarranted under the circumstances, that may have presented a different question, as we could then reasonably hold Smith to the task of addressing plaintiff's specific claims.
This injury is arguably also somewhat unique in that the surgery plaintiff underwent is highly controversial within the medical community. Smith's expert explained that coccyx injuries take up to a year to fully heal and that coccygectomies carry significant risk of complication and are often never recommended at all. Thus, it was the opinion of Smith's expert that plaintiff's coccygectomy, an "absolute last resort," would not have been performed on or before May 5, 2017 (when plaintiff's fracture was ultimately discovered) — a mere three months postinjury. To discount his opinion, the majority further concludes that Smith's expert misunderstood, or mispresented, "critical" facts by relying on plaintiff's testimony that she experienced "little to no" improvement in the years following her surgery when plaintiff also reported that her pain was "different" and "more tolerable." Plaintiff's testimony regarding [*8]her ongoing physical symptoms was inconsistent, but what is clear through those inconsistencies is that it took her "years" to recover from the surgery and that she still has "daily pain" even with her coccyx removed. The expert's utilization of the questioned testimony in addressing whether her ultimate prognosis would have changed absent Smith's alleged breach thus does not reveal a misunderstanding of facts that warrants rejecting his expert's opinion. There is also nothing to suggest that Smith's expert ignored medical records; his recitation of the records he reviewed is standard, and notably not appreciably different from that of the other experts even in this very case. For all of these reasons, it is our view that Smith established, prima facie, that he was not a proximate cause of plaintiff's injuries (see Shashi v South Nassau Communities Hosp., 104 AD3d 838, 838 [2d Dept 2013]; Goldsmith v Taverni, 90 AD3d 704, 705 [2d Dept 2011]), shifting the burden to plaintiff.
In opposition, plaintiff submitted only the affidavit of a hospital electronic records system administrator concerning the alleged error in uploading plaintiff's March 15, 2017 MRI films. Although an expert medical opinion may not be needed where the causal relationship between the alleged malpractice and the plaintiff's injury is readily apparent to lay persons (see Fiore v Galang, 64 NY2d 999, 1001 [1985]; Macey v Hassam, 97 AD2d 919, 919-920 [3d Dept 1983]; see also Knight v State of New York, 127 AD3d 1435, 1435 [3d Dept 2015], appeal dismissed 25 NY3d 1212 [2015]), whether and to what extent plaintiff's treatment or outcome would have changed if her fracture had been diagnosed earlier cannot be deemed a matter of common knowledge (see Duffen v State of New York, 245 AD2d 653, 653 [3d Dept 1997], lv denied 91 NY2d 810 [1998]; Macey v Hassam, 97 AD2d at 920). Any hearsay offered by plaintiff during her deposition testimony to that end is, standing alone, insufficient to require a trial (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). We would therefore find that, in the complete absence of any expert medical evidence refuting Smith's proffer, Supreme Court erred in declining to grant his motion in full (see Longtemps v Oliva, 110 AD3d 1316, 1319 [3d Dept 2013]; see also Guthier v DiPreta, 234 AD3d 1166, 1169-1170 [3d Dept 2025]; Suib v Keller, 6 AD3d 805, 806 [3d Dept 2004]).
Ceresia, J., concurs.
ORDERED that the order is affirmed, with costs.

Footnotes

Footnote 1: Canton Potsdam was originally named as a defendant, but the action was later discontinued as against it.

Footnote 2: To the extent that the dissent may be read as implying that plaintiff is somehow precluded from making this argument because of perceived deficiencies in her pleadings, we note that Smith made no such argument on appeal and has, therefore, waived the same (see generally Pompa v Burroughs Wellcome Co., 259 AD2d 18, 20 n 2 [3d Dept 1999]); First Natl. Bank of Amenia v Mountain Food Enters., 159 AD2d 900, 901 [3d Dept 1990]). In any event, although plaintiff's pleadings may not be models of clarity, we believe they were sufficient to give Smith notice of her claims, which is supported by the fact that plaintiff was questioned extensively about these very issues in her pretrial deposition. Based on Smith's submissions both below and on appeal, he clearly understood this to be the crux of plaintiff's claim against him.

Footnote 3: Coccyx injections may then also be considered to reduce and manage pain.
Footnote 4: One May 2017 report from plaintiff's physical therapy reflects that plaintiff felt her pain was improving with physical therapy and that, although "the tape hurts while it is . . . on," "after she feels better."